# WHEELING.

## STATE OF WEST VIRGINIA v. DOUGLASS.

Submitted June 28, 1882—Decided November 18, 1882.

1. A judgment based on a verdict in either a civil or criminal case will be reversed by the Appellate Court, if the record shows, that there was no issue made up by the pleadings in the case. (p. 777.)

2. The entire professional intercourse between an attorney and his client, whatever it may have consisted in, should be protected by profound secrecy. Hence professional communications of every character are forbidden to be given in evidence against a client by an attorney. (p. 780.)

3. By professional communications are meant, not only what the

client may have said to his attorney as such, but also every fact, which the attorney has learned only in his character as attorney.    (p. 781.)

4. If for instance, a prisoner charged with murder informs his attorney where the pistol, with which the man was murdered, is hidden, the attorney can not state to the jury, that he found the pistol, as his finding it was the result only of the knowledge of the place where it was hidden, which was communicated to him by his client; and the rule, which prohibits him from disclosing professional communications, is violated by his stating, where the pistol was found, though he refrains from stating, that his knowledge of where it was to be found, was derived from what his client told him.    (p. 783.)

5. If having found the pistol in this manner he were to put it into his trunk, where it should be found by others by reason of their having gone into his trunk to search for it, though they made such search in his absence and unlawfully, whether their suspicion, that he had this pistol, arose from his improper disclosures of what he had learned from his client or not, such persons so finding such pistol may produce it before the jury and prove the simple fact, that they found it in the trunk of the attorney for the prisoner; but they can not state to the jury what the attorney said to them, or they to him, on the occasion of such finding or at any other time in reference to this pistol, or how it came into his possession.    Nor will the attorney be permitted to say anything whatever to the jury in reference to such pistol.    (p. 784.)

6. The commonwealth has a right on such trial to prove the fact, that the pistol wherewith the murdered man was shot, was found, and where and when it was found; though it was found in consequence of statements, as to where it was to be found, extorted improperly from the prisoner, or improperly made by the attorney of the prisoner, in violation of his duty to his client to keep secret professional communications made to him by his client.    (p. 789.)

Writ of error to a judgment of the circuit court of the county of Grant rendered on the 3d day of October, 1877, in an action upon an indictment for murder in the said court then pending, wherein the State of West Virginia was plaintiff and William S. Douglass was defendant, allowed upon the petition of said Douglass.

Hon. James D. Armstrong, judge of the twelfth judicial circuit rendered the judgment complained of.

GREEN, JUDGE, furnishes the following statement of the case.

Wm. S. Douglass, was on June 5, 1877, indicted in the circuit court of Grant county, for the murder of David Hiser, by shooting him with a pistol, on April 3, 1877. The prisoner was brought into court, and his counsel moved the court to quash the indictment and each count thereof, which the court refused to do, and he then demurred to the indictment and each count thereof, which demurrer the court overruled.

I deem it unnecessary to set out the indictment, as it is not objected to in this Court and I perceive no defect in it. The prisoner then asked to change the venue for the trial to some other county. On this application affidavits were filed, and testimony given before the court, both by the prisoner and State. These, for reasons which will be stated in the opinion, I deem unnecessary to set out. The court overruled the application of the prisoner for a change of the venue for the trial. And the prisoner then asked the court to continue the case which the court did. At the next term of the court the prisoner having been brought into court by his attorney, renewed the motion for a change of the venue for the trial, which was again refused by the court. A list of twenty qualified jurors from those in attendance, and those summoned by order of the court, having been made up and the accused having stricken off eight, a jury consisting of twelve persons were sworn to well and truly try, and true deliverance make between the State and William Seymour Douglass, the prisoner then at the bar, and a true verdict give according to the evidence.

The trial lasted from September 21, 1877, to October 2, 1877, when the jury rendered their verdict, in which they found the prisoner Wm. Seymour Douglass, guilty of murder in the first degree as charged in the indictment; and they further found that he be punished by confinement in the penitentiary. This verdict was endorsed on the indictment. On the 3d of October, 1877, the prisoner moved the court for a new trial, which the court refused. He also moved the court to arrest the judgment, because the indictment was found at a special term, which motion the court overruled. The court then pronounced its judgment, that the prisoner be punished by confinement in the penitentiary

of this State during his natural life.   Six bills of exceptions
were taken by the prisoner.   The first was to the refusal of
the court to change the venue for the trial, which sets out the
voluminous evidence taken on this question.   The next two
exceptions were as follows:

First, "Be it remembered that upon the trial of this cause
in the circuit court of Grant county, the counsel for the State
having introduced a pistol into evidence before the jury, pro-
ceeded to show by a witness that said pistol had been ob-
tained by him from one of the counsel for the prisoner, to
which the prisoner, by his counsel, claiming that said pistol
was a privileged communication, as set forth in bill of excep-
tions No. 3, which is to be taken as part hereof, objected,
but the court overruled said objection and allowed said evi-
dence as to the pistol having been obtained from said coun-
sel to go before the jury, but, as was stated at the time, he
would instruct the jury, subsequently done in the instruction
marked No. 3; to which action and decision of the court in
admitting said evidence before the jury the prisoner, by his
counsel, excepted, and prays that this his bill of exception
may be signed, sealed and enrolled, which is done accord-
ingly.

"JAS. D. ARMSTRONG, [SEAL.]

"Second, Be it remembered that upon the trial of this cause
in the circuit court of Grant county, the counsel for the State
having previously offerred evidence tending to prove that
there were four shots fired on the morning of the day and
in the direction of the place where the murder was supposed
to have been committed, and when the body was found that
the ball taken from the body of the deceased was an army
pistol ball, and that a certain army pistol had been in
the possession of one Peter Welton, a brother-in-law of the
prisoner, and that said pistol was kept by said Welton prior
to the murder in a certain bureau drawer in his house, and
that the pistol was last put by him in said bureau and
had four loads in it, two having been shot out of it, and that
the same had not been seen by said Welton in said bureau,
or anywhere else, since it was put in the bureau aforesaid,
on the first day of January last, nor did said Welton know
where it was, and that a pistol of about the same length was

seen in said bureau, in the house of said Peter Welton, in the town of Petersburg, by another witness, a few days prior to the murder, and further that the prisoner at the date of the murder was staying with his said brother-in-law, at the said house where said bureau was kept and in which said pistol was seen, and that the prisoner was seen to go into the said house and stay a few minutes and come out again immediately before he started in the direction of the place and on the day the murder was committed, and the counsel for the State promising that they afterwards would by evidence connect and prove said pistol to be the same with which the murder was committed, offered in evidence the said pistol for the purpose of identifying said pistol by a witness then on the stand as the pistol placed in said bureau by said Peter Welton and seen by the witness as aforesaid, which pistol was obtained from one of the counsel for the prisoner; to the introduction of which, the prisoner, by his counsel, objected upon the grounds that said pistol was a privileged communication from the prisoner to his counsel, and that the same had been improperly and by force obtained from said counsel; and thereupon the assistant counsel for the State and the said counsel for the prisoner filed before the judge of said court written statements under oath as to said pistol, the said counsel for the prisoner claiming the benefit of the privilege as counsel; and other witnesses were examined by the said court; which statements of counsel and testimony of said witnesses are in the words and figures following, to-wit:    Whereupon the court having heard the arguments of counsel, overruled the said objection and permitted the said pistol to be introduced in evidence before the jury, but refused to permit any declarations of the prisoner to his counsel in regard thereto to be introduced; to which action and judgment of the court in overruling said objection and permitting said pistol to be introduced in evidence before the jury, the prisoner, by his counsel, excepted, and prays this his bill of exceptions may be signed, sealed and enrolled, which is accordingly done.

"JAS. D. ARMSTRONG.    [SEAL.]"

The statement referred to in the bill of exceptions was in substance, that the prisoner's counsel was boarding at a hotel

at the county seat of Grant, and shortly after the indictment
of the prisoner, the landlord invited the commonwealth's
attorney to go up stairs with him and they went up together,
and entered the room of the counsel of the prisoner, and in
his absence, opened his trunk, took out the tray of it, and
after removing some clothing got out a pistol, the one pro-
duced before the jury and claimed to be the one with which
the murdered man, David Hiser, was shot.   The pistol was
then put back in the trunk.   The next day, the common-
wealth's attorney went with two others to this room of the
counsel of the prisoner, to examine this pistol and told him
about it.   They found him in bed and did talk to him; in
the conversation he told them, that the pistol was a privileged
communication from his client, Wm. S. Douglass; that he
was not well and was excited, and he said the pistol would be
produced at court.   He showed it to them and one of them
placed a mark upon it, with the consent of the prisoner's
counsel.   He refused to give them the pistol.   A few days
afterwards, the commonwealth's attorney and one of his
friends, called on Norment, the prisoner's said counsel, to see
the pistol; he took them to his room and handed them the
pistol to look at, and the commonwealth's attorney declined
to return it to him.   He protested against his keeping it, but
he finally consented, that a third person should keep it till court.
He was sent for, the pistol delivered to him, and he kept it
till shortly before the court.   When he was about to leave
the place, he handed it to another, who produced it in court.

The fourth bill of exception was, to the court permitting
a witness to testify, that a track in the mud made by the
prisoner, near the place of the murder the day after it oc-
curred, in size and shape, so far as he could judge by the eye,
looked similar to a track he had seen near the supposed
place of the murder, but that he had not measured the track
made by the prisoner.   The fifth bill of exceptions was as
follows:

"Be it remembered that upon the trial of this cause in the
circuit court of Grant county, the attorneys for the State
having introduced into evidence before the jury a certain
pistol which had been obtained from one of the counsel for
the prisoner, there having been evidence tending to prove

that the murder had been committed with said pistol, propounded to said counsel the following questions: First, 'Did you find the pistol?' Second, 'Where did you find it?' To which questions the witness answered as follows, to-wit: First, "I did.' Second, 'I found it under a plank near the fence, inside the field, just below the residence of Mr. B. J. Baker, on the same side of Moorefield pike as Mr. Baker's house, about one hundred yards below Mr. Baker's house. I found the pistol a few days before the special term of the circuit court here, in June last.' The Moorefield pike is the road that leads from Petersburg to or past the place where the body of deceased was found, which the evidence showed prisoner had traveled the morning the murder is supposed to have been committed. To the asking of said questions and the permitting of said testimony of said counsel as to said matters being given in evidence, the prisoner, by his counsel, objected, both the prisoner and said counsel claiming that all said counsel knew about said pistol had been communicated by said prisoner to said counsel in confidence and professionally as counsel, as is set forth in bill of exceptions No. 3 to be taken as part hereof, and that nothing as to said matter could be divulged by said counsel without violating the professional and privileged communication made to said counsel by the prisoner; and the court having heard the arguments of counsel, overruled said objection and compelled said counsel to testify where he found said pistol, but nothing as to what had been communicated to him by said prisoner as to the same. To which action and judgment of the court the prisoner, by his counsel, excepted, and prays that this his bill of exceptions may be signed, sealed and enrolled, which is accordingly done.        "JAS. D. ARMSTRONG. [SEAL.]"

The last bill of exception, was to the second refusal of the court to change the venue of the trial.

The prisoner obtained from this Court a writ of error to the judgment of the circuit court, sentencing him to the penitentiary for life. This writ of error was dismissed, because of the failure to print as required by law, in the proper time, the record; but on the 29th of April, 1882, another writ of error was granted the prisoner on his application, to this judgment of the circuit court.

*Robert White* for plaintiff in error cited Acts 1872–3 p. 48 § 7; Acts 1875 ch. 86 § 16–17; Constitution W. Va. art. 3 § 14; Bouv. L. Dict. title "Trial;" *Ib.* title "Grand Jury;" *Strauder* v. *Renis*, 10 Otto; 4 Parker's Crim. Cas. 602; 2 W. Va. 60–73; 11 Leigh 662; 1 Va. Cas. 137; 2 Va. Cas. 88; Code ch. 159 p. 718 § 2; Acts 1872–3 p. 272 ch. 110; 4 Rand. 161; 9 Leigh 422; 10 Gratt. 251; 3 W. Va. 376; 4 W. Va. 180; 5 W. Va. 325; Davis Cr. Law 433 *et seq.*; 4 Munf. 430; 16 W. Va. 736; 1 Phil. Ev. Marg. pp. 147–9; 21 Gratt. 836; 2 Russ. Cr. 902–7; 4 Munf. 273.

*Attorney-General Watts* for the State: Inasmuch as it appears from the record that no plea was entered by the prisoner the judgment of the court below should be reversed.

GREEN, JUDGE, announced the opinion of the Court:

The record in this case shows, that the defendant William S. Douglass, now put in a plea to the indictment, and the jury tried the case and rendered a verdict, when no issue had ever been made. The Attorney-General admits very properly, that this is a fatal error and that court could not, on such a verdict, render any judgment. The judgment rendered must therefore be set aside, reversed and annulled, and the verdict set aside, and the case remanded to the circuit court of Grant, to be further proceeded with.

It is well settled, that if a verdict has been rendered without any issue being joined, it is a mere nullity, and no judgment can properly be rendered upon it, whether it be a civil or a criminal action. See *Stevens* v. *Taliaferro*, 1 Wash. 155; *Grymes* v. *Pendleton*, 4 Call. 130; *Taylors, &c.,* v. *Huston*, 2 H. & M. 161; *Keer* v. *Dixon*, 2 Call. 319; *Wilkinson's administrator* v. *Bennett*, 3 Munf. 316; *Sydnor* v. *Burke*, 4 Rand. 161; *McMillion* v. *Dobbins*, 9 Leigh 422; *Rowans* v. *Givens*, 10 Gratt. 250; *Baltimore and Ohio Railroad Company* v. *Gettle*, 3 W. Va. 376; *Baltimore and Ohio Railroad Company* v. *Faulkner*, 4 W. Va. 180; *Gallatin's heirs* v. *Haywood's heirs*, 4 W. Va. 1; *Baltimore and Ohio Railroad Company* v. *Christie*, 5 W. Va. 325; *State* v. *Conkle, alias Swank*, 16 W. Va. 736. In the last of these cases this Court held that it was a manifest error for the court to enter up a judgment on a verdict in a felony

case, when the record showed there had been put in a plea of not guilty, but it had been improperly put in by the attorney of the prisoner, instead of being plead by him personally. It is much more manifest, that such judgment cannot be properly entered on a verdict where the record shows, that no plea of not guilty had been put in at all. The indictment in this case is objected to, because it was made by a grand jury at a special term, ordered on April 3, 1877, by the circuit judge to be held on the 5th day of June, 1877. This was done, and the grand jury summoned under the order of the circuit judge made in strict accordance with the seventh and tenth sections of ch. 15 of the Acts of 1872-3.

The discretion conferred on the circuit judge by the tenth section, is one exercised with or without an application to him; and the grounds on which he has exercised the discretion of holding a special term for the trial of a prisoner confined in jail, need not appear. And when therefore, this discretion has been exercised, it can not be reviewed by this Court. If the prisoner is confined in jail the law presumes, that he is benefited, not injured by a speedy trial. In this case, the court granted him a continuance of the case to the regular term. There is therefore no ground for this assignment of error.

It is claimed, that the proceedings are erroneous, because it does not from the record appear, that the prisoner was examined and committed by a justice under the Acts of 1875 ch. 86. This was a matter, which preceded the indictment and constitutes no part of the record of the case, and was properly omitted in copying the record. We deem it unnecessary to express any opinion on the question, whether the circuit court erred in refusing to change the venue of the trial, because of the excitement in the community which existed at the time of the trial, and the supposed difficulty in then obtaining a fair trial on that account in Grant county. The trial took place within five months after the murder. But now more than five years have elapsed, and it may well be, that the excitement produced by the murder of Hiser has subsided and even if a fair trial could not then be had in Grant county, it would not follow, that after this great lapse of time it cannot be had. Whether the case ought to be tried

in that county now, we have no means of determining, and anything we might say with reference to whether the trial should have then been had in that county, would in little or no degree, enlighten the circuit judge as to his duty in this respect, if he be again asked to to remove the case for trial to some other county.

The court did not err in permitting the evidence named in the fourth bill of exceptions, to go to the jury. The statement of the witness, that the track he saw in the mud, made by the prisoner was similar to the track in the mud near where the murder occurred, though he had never measured the track made by the prisoner and had lost his measure of the track found near the place of the murder, was of course very weak evidence to identify the prisoner as the murderer; yet the court could not say, that it had no such tendency and could not therefore properly exclude it from the jury.

It only remains to determine, whether the court erred in permitting the witness to prove before the jury, that he had obtained from the defendant's counsel, a pistol which he showed the jury, there being evidence in the cause tending to show, that this was the pistol with which the murder was committed. And it being proven, that the pistol came into the hands of counsel, solely by reason of a communication from the defendant, while he the attorney was acting as counsel for him in this cause, as set out in exceptions two and three, which have been given at length in the statement of the case; and also, whether the court erred in requiring this attorney to state to the jury, where he found this pistol, as set out in the fifth exception, also set out at length in this statement of the case.

When this case was submitted to the Court, at its spring term, this Court found that on these important points, the counsel had referred to no authorities; and it called upon them to examine these points and refer the Court to any authorities they could find bearing on them. The counsel of the defendant has since filed additional notes on this subject, but the Attorney-General has declined replying to them and has presented no views to the Court on these points. We feel it nevertheless our duty to determine these questions. Nor can we delay longer their determination, though we

have been able to find no authorities bearing directly on these questions. The defendant has been in the penitentiary some five years, and his case has been submitted to this Court some six months.

The 5th section of article 8 of our Constitution, Acts of 1872–3 p. 26 provides: "When a judgment or decree is reversed or affirmed by the Supreme Court of Appeals, every point fairly arising upon the record of the case shall be considered and decided." These points do fairly arise and must be decided. Nothing would be gained by omitting to decide them, for on another trial they must again arise, and if not decided, doubtless there would be another writ of error hereafter awarded, and these points would be again presented to this Court for decision.

In considering these questions we must bear in mind, that it is a fundamental principle of the law of evidence, that *professional communications* made by a client to his counsel, are always to be excluded from the jury; and also the grounds on which this exclusion rests, that is, on *grounds of public policy*, because greater mischiefs would probably result from requiring or permitting their admission, than from wholly rejecting them. If they were in any event, to promote the ends of justice in the particular case, to be allowed to go before a jury, the result would be highly prejudicial to the general administration of justice in other cases. As it would effectually deter all clients from making full and confidential communications to their counsels, and unless they can do so safely and do actually do so, the ends of justice could not in many cases be attained. See *Chahoon's Case*, 21 Gratt. 836, and *Parker* v. *Carter et al.*, 4 Munf. 273.

The spirit of this law of evidence would obviously be violated, if we were to confine the communications thus excluded, to the words used by the client in his conversation with his counsel, and accordingly it is held, that letters or papers, or books, left by a client with his attorney, relating to the matter about which he has been employed, cannot be required to be produced. See *Lynde* v. *Judd*, 3 Day (Conn.) 499; *Jackson* v. *Burtis*, 14 John (N. Y.) 391; *Kellogg* v. *Kellogg*, 6 Barb. (N. Y.) 116; *Durkee* v. *Leland*, 4 Vt. 612. *State* v. *Truman Squires*, 1 Tyler (Vt.) 147. Nor will the attorney be

permitted to disclose any information, which he has derived from his client confidentially, whether by oral communication, or from books and papers shown to him by his client. See *Crosby* v. *Berger*, 11 Paige (N. Y.) 377. And the fact, that though the disclosures made by the client to his attorney, may be such as to show, that the client had been guilty of a fraud prior to such disclosure, this will furnish no reason for relaxing the rule, and permitting the attorney to disclose these communications establishing fraud on his client. See *Bank of Utica* v. *Mersereau*, 3 Barb. Chy. R. (N. Y.) 595, 598; *Gray* v. *Fox*, 43 Mo. 570. *Cromack* v. *Heathcote*, 49 B. Mon. Rep. 587; *Doe* v. *Harris*, 5 Carr. & Pay R. 592; *Foster* v. *Hall*, 12 Pick. R. 89. The propriety of these decisions in the application of this principle, results from the very grounds on which the principle is based. Lord Chancellor Brougham well says in *Greenough* v. *Gaskell*, 8 Eng. Chy. 394: "The foundation of this rule is not on account of any particular importance which the law attributes to the business of the legal professors, or any particular disposition to afford them protection. But it is out of regard to the interest of justice, which cannot be upholden and to the administration of justice, which cannot go on, without the aid of men skilled in jurisprudence, in the practice of the courts, and in matter, affecting rights and obligations, which form the subject of all judicial proceedings." Or as he said in another case, *Bolten* v. *The Corporation of Liverpool*, 8 Eng. Chy. 360: "If such communications are not protected no man would dare consult a professional adviser, with a view to his defense, or to the enforcement of his rights; and no man could safely come into court, either to obtain redress, or to defend himself." Greenleaf, in his work on Evidence, vol. 1 § 240 p. 281 of thirteenth edition says: "The great object of the rule seems plainly to require that the entire professional intercourse between client and attorney, whatever it may have consisted in, should be protected by professional secrecy." Thus in the case of *Robson et al. assignees of Blackey & Buchanan*, v. *Kemp et al.*, 5 Esp. R. 52, it was claimed, that a certain paper had been destroyed with a fraudulent design by the bankrupt, and to establish its destruction the attorney of this bankrupt was called upon to testify, that he *saw* it destroyed. He stated,

that all he knew about the destruction of this paper, he had acquired from being the counsel and attorney of the bankrupt. Objection was then made to his testifying to his having seen this paper destroyed, and it was contended, "that the privilege of an attorney extended no further than to his being prevented from disclosing matters communicated to him by his client; but those things which were facts, an attorney had always been bound to prove, whether he came to a knowledge of them one way or another." But Lord Ellenborough excluded the evidence of the attorney. He said: "This is a transaction with which the party has only become acquainted from being employed as attorney. The act cannot be stripped of the confidence and communication as an attorney, the witnesses being then acting in that character. One sense is privileged as well as another. He can not be said to be privileged as to what he hears, but not as to what he sees, when the knowledge acquired as to both has been from his situation as an attorney. I therefore think, if the only knowledge he has, as to the destruction of this instrument, was acquired from the confidential communication made to him as an attorney that he cannot be examined as to it. If therefore, he knew of the destruction of this instrument by any mode except from the circumstances of his being so concerned he is bound to disclose it, not otherwise."

In this same case, see 4 Esp. 235; this attorney was called upon as a witness to prove, that the bankrupt whose assignees were plaintiffs in the suit, had made a fraudulent deed to his son. The attorney stated, that he was both the attorney of the father and the son, when he drew the deed and saw it executed. Lord Ellenbrough said: "I do not think he is bound to disclose any matter of which he has so obtained knowledge in the character of attorney by reason of the communication which took place between his client and another person, though that person also employed him as his attorney *pro pace vice*; but evidence of the deed itself stands on a different footing. An attorney from his solicitor is bound to prove the character of a deed; that is a fact no way connected with any information obtained in his character of attorney. I therefore think that he may be examined

as to that fact; and also as to the contents of the deed itself, in case it has been lost."

Applying these principles as illustrated by these cases, to the case before us, it seems to me clear, that all the testimony of the attorney for the defendant as set out in the fifth exception, stated at length hereinbefore, ought to have been rejected by the court, and it erred in permitting it to go to the jury. All that the said attorney knew about this pistol, or where it was to be found, he knew only from the communications which had been made to him by his client confidentially and professionally, as counsel in this case. And it ought therefore, to have been entirely excluded from the jury. It may be, that in this particular case this evidence tended to the promotion of right and justice, but as was well said in *Pearce* v. *Pearce*, 11 Jar. 52, in page 55, and 1 De Gex & Smale 25—27: "Truth like all other good things may be loved unwisely, may be pursued too keenly, may cost too much. And surely the meanness, and the mischief of prying into a man's confidential communications with his legal adviser, the general evil of infusing reserve and dissimulation, uneasiness and suspicion and fear, into these communications which must take place, and which, unless in a condition of perfect security, must take place uselessly or worse, are too great a price to pay for truth itself."

These enormous evils are not avoided by doing as the circuit court did, while forbidding the attorney to state, what his client had told him about this pistol, still required him to tell where it had been concealed, and where he found it from the directions of client. This action of the court was practically as mischevious in all its tendencies and consequences, as if it had required him to state everything, which his client had confidentially told him about this pistol. It would be a slight safeguard indeed, to confidential communications made to counsel, if he was thus compelled substantially, to give them to a jury, although he was required not to state them in the words of his client.

The question whether the court erred in permitting a witness to prove, that the pistol which was produced, and concerning which there was evidence tending to show that, it was the same with which the murdered man was shot, was procured

from the attorney for the defendant, is one much more difficult of solution.

I have been unable to find any authority bearing directly on this question. But it may be regarded as well settled, that though the confessions improperly obtained are not admissible, yet any facts, which have been brought to light in consequence of such confession, may be received in evidence. Thus where a prisoner was indicted as an accessory after the fact for having received property, knowing it to be stolen, and had under promise of favor, made a confession, and in consequence of it, the property had been found in his lodgings concealed between the shuckings of his bed; it was held, that the fact of finding the stolen property in his custody might be proved, although the knowledge of it was obtained by means of an inadmissible confession. *Rex* v. *Warickshall*, 1 Leach Crown Law Cases 242. See *Dorothy Money's Case* stated in note to said case p. 250. So in *Rex* v. *Harris*, R. & M. C. C. R. 338; where a shirt had been stolen and buried, and the prisoner pointed out the place where it was buried and the place was examined and the shirt found. So in *Thurtell's Case* cited in Alison Cr. L. of Scotland p. 584; and Joy 84. Although a confession obtained by means of promises or hopes of immunity held out, could not be used in evidence against a party, yet the fact, that the goods were recovered or the corpse found in consequence of the confession, at the place mentioned in the confession, was held to be receivable in evidence. So in *Lochhart's Case*, Leaches Crown Cases p. 329; where a prisoner indicted for stealing a number of diamonds and pearls, had been improperly induced to make a confession, from which it appeared, that he had disposed of a part of them to a certain person; it was held allowable on the part of the prosecution, to call that person to prove, that he had received the property from the prisoner.

There are some cases which have gone even further than these three and have held, that where the prisoner has been induced by improper means to confess to the stealing of goods, and to tell where they were concealed, testimony has been permitted not only to prove the finding of the goods and the place where they were found, but also to prove that the pris-

oner in his confession described this *as the place where they would be found.*   *Grant's Case* and *Hodge's Case,* 2 East P. C. 657 and 658.

In such case it is clear, that the bare fact of finding the goods in a certain place might be no sort of evidence against the prisoners, unless this fact was coupled with the knowledge of the prisoner, that the goods were there; and this knowledge of the prisoner was only ascertained by letting in evidence of a portion of his confession, which had been improperly obtained from him.   And the propriety of this has been seriously questioned.   Thus in *Harvey's Case,* 2 East P. C. 658, Lord Eldon, C. J., said: "That where the knowledge of any fact was obtained from a prisoner under such a promise as excluded the confession itself from being given in evidence, he should direct an acquittal unless the fact itself proved would have been sufficient to warrant a conviction without any confession leading to it; and in that case he so directed the jury.   But the modern English decisions seem to incline to permitting so much of the confession as relates *strictly* to the fact discovered by it, but no more to be given in evidence.   The reason for this seems to be, that it is considered, that the only reason for rejecting extorted confessions is the apprehension, that the prisoner may have been induced to say what is false, but the fact discovered shows, that so much of the confession as *immediately* relates to it is true.   2 East P. C. c 16 s 94 p 658; *Reg.* v. *Gould,* 9 C. & P. 364; (38 Eng. C. L. R. 156.)

But this can hardly be fairly regarded as the settled law in England, for in *Reg.* v. *Bernman,* C. Cox C. C. 388, while the finding of a child's body was presented as a fact to be found, yet Earle, J., refused to permit the confessions of the prisoner improperly obtained from her, and her statement where it was to be found to go to the jury.   He said, "he could not allow the finding to be thus connected with the prisoner."   And in *Rel.* v. *Griffin,* R. & R. 151, the court was divided on a question apparently involving this point; but a majority of the court, seven judges concurring permitted the statement of the prisoner obtained from him improperly, when he gave up a stolen bank note, to identify it as the note stolen from the prosecutor from this judgment, so far as

99

it permitted the statement of the prisoner thus obtained, to establish the identity of the notes produced by the prisoner as the notes stolen, two of the judges dissented. In *Frederick* v. *The State*, 3 W. Va. 695; the Court of Appeals of this State, seem to have acted on the views of a majority of the court in this English case.

The American decisions show the same diversity of opinion on the question, whether a confession obtained from a prisoner by threats or promises, can be used against him for any purpose, or whether when such confession is corroborated by the finding of the stolen goods or dead body, where the prisoner said it could be found; so much of the confession as is thus shown to be true, that is the admission of the prisoner that he knew where the goods stolen, or the dead body was hidden, may not be used against the prisoner. The weight of mere authority here as in England, seems to be in favor of admitting so much of an extorted confession to go to the jury as shows, the knowledge of the prisoner where the stolen property or corpse was hid, when it is found, where the prisoner in the confession extorted from him said it was, but there are highly respectable American as well as English authorities that hold that, every part of such extorted confession should be excluded from the jury. But the American authorities all agree, that though a confession obtained by threats or promises from a prisoner, ought to be excluded, yet if in such confession he states where the stolen goods or body of the murdered person are to be found, and in consequence thereof they are found in the place indicated, the fact may be proven where and when the stolen goods or the corpse of the murdered man was found.

The American as well as the English cases, only differ as to whether you can show the knowledge of the prisoner, as to where the stolen goods or the corpse of the dead man was found by such extorted confessions, and thus by his confession, connect him with the fact, that the goods or corpse had been concealed in that particular place. Some holding you may, others that you cannot, but all agreeing, that the simple fact, that the goods stolen or the corpse was found in a particular place, no matter in what manner the information was obtained, which led to the finding of the goods or body

in such place.   This will I.think be found to be the view
taken by the American authorities, as will appear from an
examination of the following cases.   *Com.* v. *Knapp*, 9 Pick.
496; *State* v. *Brick*, 2 Harring. 530; *State* v. *Crank*, 2
Bailey 77; *State* v. *Vaigneur*, 5 Rich. 391; *Jordan* v. *State*, 32
Miss. 382; *Belote* v. *State*, 36 Miss. 96; *Jane* v. *Com.* 2 Met.
(Ky.) 30; *Elizabetha* v. *State*, 27 Tréad. 329; *People* v. *Hoy-
yen*, 34 Cal. 176; *People* v. *Parton*, 49 Cal. 632; *Fredrick* v.
*State*, 3 W. Va. 695; *Rice* v. *The State*, 3 Heisk. 215; *Strait*
v. *State*, 43 Texas 486; *State* v. *Mortimer*, 20 Kan. 93; *State* v.
*Due*, 7 Foster 256; *State* v. *Garvey*, 28 La. Ann. 925.

From these authorities English and American, we deduce
this law: First. If a murder is committed, and the prisoner by
threats or promises is induced to confess his guilt, this confession
cannot be used against him.   Second. If in such confession
he states, that the corpse of the murdered man is buried
under the prisoner's house, and it is found there the fact, that
it was found there may be proved at the trial, though it
might have a strong tendency to establish the guilt of the
prisoner.

This conclusion is well sustained by both the English and
American authorities; and it seems to me obvious, that no
other conclusion can be reached, for if in such a case it was
held, that the commonwealth could not on the trial prove,
that the body was found buried under the prisoner's house;
the result would be, that the commonwealth would be
deprived of very important and necessary evidence by the
fact that some officious intermeddler had secured a confession
from the prisoner by improper threats.   If such improper
threats were used it is clear, that the confession of the pris-
oner so obtained, ought not to be used against him, and all
the authorities agree, that it cannot.   But if in order to pro-
tect the prisoner, we were to go further and say, that the
commonwealth should, because of such threats, be deprived
of the right to prove, that the body of the murdered man
was found buried under the prisoner's house would be
obviously unjust to the public, as for all that can be known,
this fact might have been discovered even if such improper
threats and such a confession had never been made.   Thirdly.
If such confession was, that the prisoner had committed the

murder and the body of the murdered man was buried in a remote place, which in itself would attach no suspicion to to the prisoner as the murderer, the authorities are not agreed, as to whether the commonwealth on the trial would be confined to the simple proof of the finding of the body buried in this remote place, or whether it would be permitted further to prove, that it was found in this remote place in consequence of such confession of the prisoner indicating that it would be found there.

This is an important question for it is obvious, that if the commonwealth is permitted to prove in this way the knowledge of the prisoner, where the body of the murdered man was buried, it would in many cases go very far towards his conviction. And his confession improperly extorted from him, would lead to his conviction. This would differ in effect but little from permitting the whole extorted confession to go before the jury. The decisions which justify this, are based on the assumption, that the only reason why a confession however improperly obtained, is excluded from being given in evidence is, that if it was improperly obtained, it is almost or quite as likely to be false as true; and that as the body in such case was found buried where the prisoner stated it was to be found, it proves incontestably the truth of that portion of his confession, which stated it was buried there, and therefore this much and this much only of such confession, ought to be allowed to go to the jury in evidence.

If the assumption, that this is the only ground for excluding from evidence an extorted confession, then it must be admitted that this reasoning is sound; but I must be permitted to express my doubt as to the truth of this assumption, though the text writers generally assign the probability of its falsity, as the reason for excluding such extorted confession. But I am rather inclined to the opinion, that while this is unquestionably one of the reasons for this exclusion, yet it is not the only one, and that it is or should be excluded also, because it is prejudicial to good morals and the real public interest, which is not to convict even criminals by using against them evidence, which has been improperly extorted from them by either threats or promises. And if this be so, nothing should be permitted to be proven in such case,

but the simple fact, that the body of the murdered man was found buried in such remote place and the fact, that the prisoner knew it, which was improperly extorted from him, ought not to be permitted to go to the jury; but it is unnecessary to form a definite conclusion on this subject in order to arrive at correct conclusions in this case.

We will now suppose the case we have suggested modified, and that the prisoner admits to his counsel employed to defend him, that he committed the murder and buried the body of the murdered man under his the prisoner's house, and the attorney, instead of keeping this a profound secret, tells it and in consequence of his so doing, the body is found buried under the prisoner's house. It seems to me obvious, that as when this was told by the prisoner, even under threats, the commonwealth could prove on his trial, that the body was found buried under his house. So when it has been told by his attorney, the commonwealth could still prove the same thing. If it could not, the prisoner's attorney could at his pleasure, deprive the commonwealth of most important evidence. He might tell, where his client had told him the body was buried, when he perceived, that it was on the eve of being discovered, and with a view of preventing so damaging a fact from being proved at the trial against his client.

While therefore the simple fact, that the body of the murdered man had been found and where it had been found, could in every case be proven and to hold otherwise would be to do gross injustice to the commonwealth. It seems to me very obvious, that no statement of the attorney either before the jury or to other persons, should be ever permitted to be heard to show, that the prisoner had any knowledge of where the body was buried. It may be, that the place where the body was found buried, might be strong evidence of the knowledge of the prisoner of where it was buried, as where it was found under the prisoner's own house. But it might be, that it was found buried in a remote place, which in itself would attach no suspicion of the prisoner having any knowledge on the subject. In such case I can conceive of no greater outrage on public policy, than to permit the statements of his counsel, that the prisoner had informed

him where the body was buried, to get before the jury either directly by permitting him to state, or indirectly by permitting others to testify, that he had so told them.

Where the prisoner himself has had extorted from him a confession of the crime, and where the body is buried and is found at the place which he indicates, it is true that some courts have permitted not only the fact, that the body was found to be proven, but also the fact, that the prisoner in the confession extorted from him had truly stated where it was buried. Yet when this has been allowed, it has always been on the assumption, that the only reason why such extorted confession was kept from the jury, was its probable want of truth.

But in this respect, the communications of the prisoner to his counsel stand as is universally admitted, on a very different footing. They are not excluded as extorted confessions are, because of their probable want of truth, and though they were ever so strongly corroborated they would be excluded. For they are excluded simply on account of public policy; because it is considered, that public interest would be promoted by letting even criminals escape just punishment, rather than to obtain their punishment by destroying the confidence of all clients and prisoners in their counsel, which would be the necessary consequence of permitting under any circumstances, these professional communications from being disclosed by an attorney. If this be not firmly upheld as the law, gross wrong would be done many a client and many an innocent prisoner; because they would always be apprehensive, that they could not safely tell the truth to their own counsel, and unless it could be safely told in many instances, no defense could be effectively made though one in fact existed.

My conclusions therefore are, that the commonwealth had a perfect right to introduce before the jury the pistol, with which it claims the murder was committed, and to prove where it was found. Nor can it be justly deprived of this right by the disclosure made by the prisoner's counsel, that from communications with his client he had obtained possession of the pistol. If this could be done, the prisoner's counsel could effectually prevent the commonwealth from either

finding or producing before the jury this pistol. Nor could the improper conduct of the landlord of the commonwealth's attorney, in searching the trunk of the prisoner's counsel in his absence, or any improper means they may have used to get possession of this pistol, ever deprive the commonwealth of its right to produce it and prove where it was found. But this is the full right of the commonwealth.

How it came into the possession of the prisoner's counsel, the commonwealth ought not to be permitted to show, by either a direct or indirect breach of the confidence between the prisoner and his attorney. The witnesses ought not to be permitted to state to the jury, that this attorney claimed that he had this pistol by and through communications with the prisoner. Nor should they be permitted to state what passed between them and this attorney when they got possession of the pistol, nor at any other time. The simple fact, that the identical pistol produced before the jury was found in the possession, at a certain time, of the prisoner's counsel is all that the commonwealth has a right to prove in reference to the finding of this pistol. Nor should the prisoner's attorney be permitted to testify in any manner in reference to this pistol, as all he ever knew about it he derived as he states by confidential communications with the prisoner.

The court therefore did not err in the matters complained of in the bills of exceptions number two and number three, except perhaps, sufficient caution may not have been used by it in excluding carefully from the jury, the hearing of all conversations or communications held by the counsel of the prisoner with others in reference to this pistol.

The jury ought not to be even informed, that the prisoner's attorney had any objection to this pistol passing into the hands of these witnesses, and being produced at the trial. Nor did the court err, as we have seen, in the matters complained of in the fourth bill of exceptions. As we have said it is unnecessary for us to decide, whether the court erred in the matters complained of in bills of exceptions number one and number six. It did err in the matters complained of in bill of exception number five.

For the reasons stated the judgment of the circuit court rendered October 3, 1877, as well as the verdict on which it

was based must be set aside and annulled, and this cause must be remanded to the circuit court of Grant county, to be proceeded with in accordance with the principles laid down in this opinion and further according to law. But it appearing, that the plaintiff in error is now in the penitentiary in execution of the said judgment against him, it will therefore be necessary to have him brought before this Court by a *habeas corpus*, and committed to the custody of the sheriff of Ohio county, to be by him conveyed to the jail of the county of Grant for the purpose of being tried for the offense aforesaid. A writ of *habeas corpus* is accordingly awarded, directed to the superintendent of the penitentiary, commanding him to bring the prisoner before this Court at — o'clock on —— day of November, 1882.

THE OTHER JUDGES CONCURRED.

JUDGMENT REVERSED.