[Crim. No. 21291. July 20, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL MEREDITH et al., Defendants and Appellants.

684

**COUNSEL**

John T. Ketelsen, under appointment by the Supreme Court, Quin Denvir and Paul Halvonik, State Public Defenders, Gary S. Goodpaster, Chief Assistant State Public Defender, Richard E. Shapiro and Ezra Hendon, Deputy State Public Defenders, and Raul A. Ramirez, under appointments by the Court of Appeal, for Defendants and Appellants.

David Michael Bigeleisen as Amicus Curiae on behalf of Defendant and Appellant Scott.

George Deukmejian and Evelle J. Younger, Attorneys General, Robert H. Philibosian and Jack R. Winkler, Chief Assistant Attorneys General, Arnold O. Overoye, Assistant Attorney General, Marjory Winston Parker, Joel Carey, J. Robert Jibson and John R. Duree, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

Stanley M. Roden, District Attorney (Santa Barbara), and Gerald McC. Franklin, Deputy District Attorney, as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**TOBRINER, J.**—Defendants Frank Earl Scott and Michael Meredith appeal from convictions for the first degree murder and first degree

robbery of David Wade. Meredith's conviction rests on eyewitness testimony that he shot and killed Wade. Scott's conviction, however, depends on the theory that Scott conspired with Meredith and a third defendant, Jacqueline Otis, to bring about the killing and robbery. To support the theory of conspiracy the prosecution sought to show the place where the victim's wallet was found, and, in the course of the case this piece of evidence became crucial. The admissibility of that evidence comprises the principal issue on this appeal.

At trial the prosecution called Steven Frick, who testified that he observed the victim's partially burnt wallet in a trash can behind Scott's residence. Scott's trial counsel then adduced that Frick served as a defense investigator. Scott himself had told his former counsel that he had taken the victim's wallet, divided the money with Meredith, attempted to burn the wallet, and finally put it in the trash can. At counsel's request, Frick then retrieved the wallet from the trash can. Counsel examined the wallet and then turned it over to the police.

The defense acknowledges that the wallet itself was properly admitted into evidence. The prosecution in turn acknowledges that the attorney-client privilege protected the conversations between Scott, his former counsel, and counsel's investigator. Indeed the prosecution did not attempt to introduce those conversations at trial. The issue before us, consequently, focuses upon a narrow point: whether under the circumstances of this case Frick's observation of the *location* of the wallet, the product of a privileged communication, finds protection under the attorney-client privilege.

This issue, one of first impression in California, presents the court with competing policy considerations. On the one hand, to deny protection to observations arising from confidential communications might chill free and open communication between attorney and client and might also inhibit counsel's investigation of his client's case. On the other hand, we cannot extend the attorney-client privilege so far that it renders evidence immune from discovery and admission merely because the defense seizes it first.

Balancing these considerations, we conclude that an observation by defense counsel or his investigator, which is the product of a privileged communication, may not be admitted unless the defense by altering or removing physical evidence has precluded the prosecution from making that same observation. In the present case the defense investiga-

tor, by removing the wallet, frustrated any possibility that the police might later discover it in the trash can. The conduct of the defense thus precluded the prosecution from ascertaining the crucial fact of the location of the wallet. Under these circumstances, the prosecution was entitled to present evidence to show the location of the wallet in the trash can; the trial court did not err in admitting the investigator's testimony.

The other contentions presented by Scott, and all contentions raised by codefendant Meredith, were fully addressed in the Court of Appeal opinion. We affirm the convictions, as modified, for the reasons stated in that opinion.

We first summarize the evidence other than that relating to the discovery and location of the victim's wallet. Our summary is based upon the testimony of Jacqueline Otis[1] and Laurie Ann Sam, the key prosecution witnesses, upon the statement given the police by defendant Scott, and upon Scott's trial testimony.

On the night of April 3, 1976, Wade (the victim) and Jacqueline Otis, a friend of the defendants, entered a club known as Rich Jimmy's. Defendant Scott remained outside by a shoeshine stand. A few minutes later codefendant Meredith arrived outside the club. He told Scott he planned to rob Wade, and asked Scott to go into the club, find Jacqueline Otis, and ask her to get Wade to go out to Wade's car parked outside the club.

In the meantime, Wade and Otis had left the club and walked to a liquor store to get some beer. Returning from the store, they left the beer in a bag by Wade's car and reentered the club. Scott then entered the club also and, according to the testimony of Laurie Ann Sam (a friend of Scott's who was already in the club), Scott asked Otis to get Wade to go back out to his car so Meredith could "knock him in the head."

When Wade and Otis did go out to the car, Meredith attacked Wade from behind. After a brief struggle, two shots were fired; Wade fell, and Meredith, witnessed by Scott and Sam, ran from the scene.

Scott went over to the body and, assuming Wade was dead, picked up the bag containing the beer and hid it behind a fence. Scott later re-

---

[1]Otis was initially charged as a codefendant. On motion by the prosecution the court dismissed the charges against her, and she testified for the prosecution.

turned, retrieved the bag, and took it home where Otis and Meredith joined him.[2]

We now recount the evidence relating to Wade's wallet, basing our account primarily on the testimony of James Schenk, Scott's first appointed attorney. Schenk visited Scott in jail more than a month after the crime occurred and solicited information about the murder, stressing that he had to be fully acquainted with the facts to avoid being "sandbagged" by the prosecution during the trial. In response, Scott gave Schenk the same information that he had related earlier to the police. In addition, however, Scott told Schenk something Scott had not revealed to the police: that he had seen a wallet, as well as the paper bag, on the ground near Wade. Scott said that he picked up the wallet, put it in the paper bag, and placed both behind a parking lot fence. He also said that he later retrieved the bag, took it home, found $100 in the wallet and divided it with Meredith, and then tried to burn the wallet in his kitchen sink. He took the partially burned wallet, Scott told Schenk, placed it in a plastic bag, and threw it in a burn barrel behind his house.

Schenk, without further consulting Scott, retained Investigator Stephen Frick and sent Frick to find the wallet. Frick found it in the location described by Scott and brought it to Schenk. After examining the wallet and determining that it contained credit cards with Wade's name, Schenk turned the wallet and its contents over to Detective Payne, investigating officer in the case. Schenk told Payne only that, to the best of his knowledge, the wallet had belonged to Wade.

The prosecution subpoenaed Attorney Schenk and Investigator Frick to testify at the preliminary hearing. When questioned at that hearing, Schenk said that he received the wallet from Frick but refused to answer further questions on the ground that he learned about the wallet through a privileged communication. Eventually, however, the magistrate threatened Schenk with contempt if he did not respond "yes" or "no" when asked whether his contact with his client led to disclosure of the wallet's location. Schenk then replied "yes," and revealed on further questioning that this contact was the sole source of his information as to the wallet's location.

---

[2]Meredith offered an alibi defense. He testified that he spent the evening at the Kit-Kat Club and another club across the street, and was never in the vicinity of Rich Jimmy's. Two witnesses partially corroborated his alibi.

At the preliminary hearing Frick, the investigator who found the wallet, was then questioned by the district attorney. Over objections by counsel, Frick testified that he found the wallet in a garbage can behind Scott's residence.

Prior to trial, a third attorney, Hamilton Hintz, was appointed for Scott. Hintz unsuccessfully sought an *in limine* ruling that the wallet of the murder victim was inadmissible and that the attorney-client privilege precluded the admission of testimony concerning the wallet by Schenk or Frick.

At trial Frick, called by the prosecution, identified the wallet and testified that he found it in a garbage can behind Scott's residence. On cross-examination by Hintz, Scott's counsel, Frick further testified that he was an investigator hired by Scott's first attorney, Schenk, and that he had searched the garbage can at Schenk's request. Hintz later called Schenk as a witness: Schenk testified that he told Frick to search for the wallet immediately after Schenk finished talking to Scott. Schenk also stated that Frick brought him the wallet on the following day; after examining its contents Schenk delivered the wallet to the police. Scott then took the stand and testified to the information about the wallet that he had disclosed to Schenk.

The jury found both Scott and Meredith guilty of first degree murder and first degree robbery. It further found that Meredith, but not Scott, was armed with a deadly weapon. Both defendants appeal from their convictions.

Defendant Scott concedes, and we agree, that the wallet itself was admissible in evidence. Scott maintains, however, that Evidence Code section 954 bars the testimony of the investigator concerning the location of the wallet. ■ We consider, first, whether the California attorney-client privilege codified in that section extends to observations which are the product of privileged communications. We then discuss whether that privileged status is lost when defense conduct may have frustrated prosecution discovery.

Section 954 provides, "[T]he client ... has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer ...." Under that section one who seeks to assert the privilege must establish that a confidential communication occurred during the course of the attorney-client relationship.

(8 Wigmore, Evidence (McNaughton rev. ed. 1961) § 2292; Witkin, Cal. Evidence (2d ed. 1966) § 794.)

Scott's statements to Schenk regarding the location of the wallet clearly fulfilled the statutory requirements. Moreover, the privilege did not dissolve when Schenk disclosed the substance of that communication to his investigator, Frick. Under Evidence Code section 912, subdivision (d), a disclosure which is "reasonably necessary" to accomplish the purpose for which the attorney has been consulted does not constitute a waiver of the privilege. If Frick was to perform the investigative services for which Schenk had retained him, it was "reasonably necessary," that Schenk transmit to Frick the information regarding the wallet.[3] Thus, Schenk's disclosure to Frick did not waive the statutory privilege.

The statutes codifying the attorney-client privilege do not, however, indicate whether that privilege protects facts viewed and observed as a direct result of confidential communication. To resolve that issue, we turn first to the policies which underlie the attorney-client privilege, and then to the cases which apply those policies to observations arising from a protected communication.

■ The fundamental purpose of the attorney-client privilege is, of course, to encourage full and open communication between client and attorney. "Adequate legal representation in the ascertainment and enforcement of rights or the prosecution or defense of litigation compels a full disclosure of the facts by the client to his attorney. . . . Given the privilege, a client may make such a disclosure without fear that his attorney may be forced to reveal the information confided to him." (*City & County of S. F. v. Superior Court, supra,* 37 Cal.2d at p. 235. See

---

[3]Although prior cases do not consider whether section 912, subdivision (d) applies to an attorney's investigator, the language of that subdivision covers the circumstances of the instant case. An investigator is as "reasonably necessary" as a physician or psychiatrist (*People v. Lines* (1975) 13 Cal.3d 500 [119 Cal.Rptr. 225, 531 P.2d 793]), or a legal secretary, paralegal or receptionist. (See *Anderson v. State* (Fla. App. 1974) 297 So.2d 871; *City & County of S. F. v. Superior Court* (1951) 37 Cal.2d 227 [36 P. 1034].) Because the investigator, then, is a person encompassed by the privilege, he stands in the same position as the attorney for purposes of the analysis and operation of the privilege; the investigator cannot then disclose that which the attorney could not have disclosed. (*City & County of S. F. v. Superior Court, supra,* 37 Cal.2d at p. 236, see also Evid. Code, § 952 and Law Revision Com. comment thereto.) Thus, the discussion in this opinion of the conduct of defense counsel, and of counsel's right to invoke the attorney-client privilege to avoid testifying, applies also to a defense investigator.

also *People* v. *Canfield* (1974) 12 Cal.3d 699, 705 [117 Cal.Rptr. 81, 527 P.2d 633]; *People* v. *Atkinson* (1870) 40 Cal. 284, 285.)

In the criminal context, as we have recently observed, these policies assume particular significance: "'As a practical matter, if the client knows that damaging information could more readily be obtained from the attorney following disclosure than from himself in the absence of disclosure, the client would be reluctant to confide in his lawyer and it would be difficult to obtain fully informed legal advice. ' . . . Thus, if an accused is to derive the full benefits of his right to counsel, he must have the assurance of confidentiality and privacy of communication with his attorney." (*Barber* v. *Municipal Court* (1979) 24 Cal.3d 742, 751 [157 Cal.Rptr. 658, 598 P.2d 818], citing *Fisher* v. *United States* (1976) 425 U.S. 391, 403 [48 L.Ed.2d 39, 51, 96 S.Ct. 1569].)

Judicial decisions have recognized that the implementation of these important policies may require that the privilege extend not only to the initial communication between client and attorney but also to any information which the attorney or his investigator may subsequently acquire as a direct result of that communication. In a venerable decision involving facts analogous to those in the instant case, the Supreme Court of West Virginia held that the trial court erred in admitting an attorney's testimony as to the location of a pistol which he had discovered as the result of a privileged communication from his client. That the attorney had observed the pistol, the court pointed out, did not nullify the privilege: "All that the said attorney knew about this pistol, or where it was to be found, he knew only from the communications which had been made to him by his client confidentially and professionally, as counsel in this case. And it ought therefore, to have been entirely excluded from the jury. It may be, that in this particular case this evidence tended to the promotion of right and justice, but as was well said in *Pearce* v. *Pearce*, 11 Jar. 52, in page 55, and 2 De Gex & Smale 25-27: 'Truth like all other good things may be loved unwisely, may be pursued too keenly, may cost too much.'" (*State of West Virginia* v. *Douglass* (1882) 20 W. Va. 770, 783.)

This unbearable cost, the *Douglass* court concluded, could not be entirely avoided by attempting to admit testimony regarding observations or discoveries made as the result of a privileged communication, while excluding the communication itself. Such a procedure, *Douglass* held, "was practically as mischievous in all its tendencies and consequences, as if it has required [the attorney] to state everything, which his client

had confidentially told him about this pistol. It would be a slight safeguard indeed, to confidential communications made to counsel, if he was thus compelled substantially, to give them to a jury, although he was required not to state them in the words of his client." (*Id.*, at p. 783.)

More recent decisions reach similar conclusions. In *State v. Olwell* (1964) 64 Wn.2d 828 [394 P.2d 681, 16 A.L.R.3d 1021] the court reviewed contempt charges against an attorney who refused to produce a knife he obtained from his client. The court first observed that "[t]o be protected as a privileged communication ... the securing of the knife ... must have been *the direct result of information* given to Mr. Olwell by his client." (P. 683.) (Italics added.) The court concluded that defense counsel, after examining the physical evidence, should deliver it to the prosecution, but should not reveal the source of the evidence; "[b]y thus allowing the prosecution to recover such evidence, the public interest is served, and by refusing the prosecution an opportunity to disclose the source of the evidence, the client's privilege is preserved and a balance reached between these conflicting interests." (P. 685.)[4] (See also *Anderson v. State* (D.C. Fla. 1974) 297 So.2d 871.)

Finally, we note the decisions of the New York courts in *People v. Belge* (1975) 83 Misc.2d 186 [372 N.Y.S.2d 798], affirmed in *People v. Belge* (1975) 50 App.Div.2d 1088 [376 N.Y.S.2d 771]. Defendant, charged with one murder, revealed to counsel that he had committed three others. Counsel, following defendant's directions, located one of the bodies. Counsel did not reveal the location of the body until trial, 10 months later, when he exposed the other murders to support an insanity defense.

---

[4]The parties discuss an earlier Washington case, *State v. Sullivan* (1962) 60 Wn.2d 214 [373 P.2d 474]. Defendant in that case revealed the location of the victim's body to his counsel, who informed the sheriff. At trial the prosecution called defense counsel to testify to the location. The appellate court reversed the conviction, apparently on the ground that it was unnecessarily prejudicial to call defense counsel as a prosecution witness when sheriff's deputies and other witnesses who had seen the body were available.

The *Sullivan* court stated a general rule which supports the result we reach here—that attorney-client communications remain privileged "regardless of the manner in which it is sought to put the communications in evidence, whether by direct examination, cross-examination, or *indirectly as by bringing of facts brought to knowledge solely by reason of a confidential communication.*" (P. 476, quoting 58 Am. Jur., Witnesses, § 466.) (Italics by the *Sullivan* court.) The decision expressly left open, however, whether defense counsel could be called to prove the location of the body if other witnesses were unavailable.

Counsel was then indicted for violating two sections of the New York Public Health Law for failing to report the existence of the body to proper authorities in order that they could give it a decent burial. The trial court dismissed the indictment; the appellate division affirmed, holding that the attorney-client privilege shielded counsel from prosecution for actions which would otherwise violate the Public Health Law.[5]

The foregoing decisions demonstrate that the attorney-client privilege is not strictly limited to communications, but extends to protect observations made as a consequence of protected communications.[6] We turn therefore to the question whether that privilege encompasses a case in which the defense, by removing or altering evidence, interferes with the prosecution's opportunity to discover that evidence.[7]

In some of the cases extending the privilege to observations arising from protected communications the defense counsel had obtained the

---

[5] In each of the cases discussed in text, a crucial element in the court's analysis is that the attorney's observations were the direct product of information communicated to him by his client. Two decisions, *People v. Lee* (1970) 3 Cal.App.3d 514 [83 Cal.Rptr. 715] and *Morrell v. State* (Alaska 1978) 575 P.2d 1200, held that an attorney must not only turn over evidence given him by *third parties*, but also testify as to the source of that evidence. Both decisions emphasized that the attorney-client privilege was inapplicable because the third party was not acting as an agent of the attorney or the client.

[6] In advancing the observable fact doctrine, the Attorney General relied largely on civil cases involving pretrial discovery of expert's observations, opinions, and reports. (See, e.g., *San Diego Professional Assn. v. Superior Court* (1962) 58 Cal.2d 194 [23 Cal.Rptr. 384, 373 P.2d 448, 97 A.L.R.2d 761]; *Oceanside Union School Dist. v. Superior Court* (1962) 58 Cal.2d 180 [23 Cal.Rptr. 375, 373 P.2d 439].) Such cases arise in a context which differs from the present case; in civil cases, pretrial discovery is extensive and seldom restricted by a party's privilege against self-incrimination. Even in the cited cases, however, the court in allowing discovery carefully notes that the expert's observations do not derive from information submitted in confidence by the client. (*San Diego Professional Assn. v. Superior Court, supra*, 58 Cal.2d at p. 202; *Oceanside Union School Dist. v. Superior Court, supra*, 58 Cal.2d at pp. 188-189.)

[7] We agree with the parties' suggestion that an attorney in Schenk's position often may best fulfill conflicting obligations to preserve the confidentiality of client confidences, investigate his case, and act as an officer of the court if he does not remove evidence located as the result of a privileged communication. We must recognize, however, that in some cases an examination of evidence may reveal information critical to the defense of a client accused of crime. If the usefulness of the evidence cannot be gauged without taking possession of it, as, for example, when a ballistics or fingerprint test is required, the attorney may properly take it for a reasonable time before turning it over to the prosecution. (*Olwell, supra*, 394 P.2d, pp. 684-685.) Similarly, in the present case the defense counsel could not be certain the burnt wallet belonged in fact to the victim: in taking the wallet to examine it for identification, he violated no ethical duty to his client or to the prosecution. (See generally, *Legal Ethics and the Destruction of Evidence* (1979) 88 Yale L. J. 1665.)

evidence from his client or in some other fashion removed it from its original location (*State* v. *Olwell, supra,* 394 P.2d 681; *Anderson* v. *State, supra,* 297 So.2d 871); in others the attorney did not remove or alter the evidence (*People* v. *Belge, supra,* 372 N.Y.S.2d 798; *State* v. *Sullivan, supra,* 373 P.2d 474). None of the decisions, however, confronts directly the question whether such removal or alteration should affect the defendant's right to assert the attorney-client privilege as a bar to testimony concerning the original location or condition of the evidence.

When defense counsel alters or removes physical evidence, he necessarily deprives the prosecution of the opportunity to observe that evidence in its original condition or location. As amicus Appellate Committee of the California District Attorney Association points out, to bar admission of testimony concerning the original condition and location of the evidence in such a case permits the defense in effect to "destroy" critical information; it is as if, he explains, the wallet in this case bore a tag bearing the words "located in the trash can by Scott's residence," and the defense, by taking the wallet, destroyed this tag. To extend the attorney-client privilege to a case in which the defense removed evidence might encourage defense counsel to race the police to seize critical evidence. (See *In re Ryder* (E.D. Va. 1967) 263 F.Supp. 360, 369; Comment, *The Right of a Criminal Defense Attorney to Withhold Physical Evidence Received From His Client* (1970) 38 U.Chi. L.Rev. 211, 227-228.)

We therefore conclude that courts must craft an exception to the protection extended by the attorney-client privilege in cases in which counsel has removed or altered evidence. Indeed, at oral argument defense counsel acknowledged that such an exception might be necessary in a case in which the police would have inevitably discovered the evidence in its original location if counsel had not removed it. Counsel argued, however, that the attorney-client privilege should protect observations of evidence, despite subsequent defense removal, unless the prosecution could prove that the police probably would have eventually discovered the evidence in the original site.

We have seriously considered counsel's proposal, but have concluded that a test based upon the probability of eventual discovery is unworkably speculative. Evidence turns up not only because the police deliberately search for it, but also because it comes to the attention of policemen or bystanders engaged in other business. In the present case,

for example, the wallet might have been found by the trash collector. Moreover, once physical evidence (the wallet) is turned over to the police, they will obviously stop looking for it; to ask where, how long, and how carefully they would have looked is obviously to compel speculation as to theoretical future conduct of the police.

■ We therefore conclude that whenever defense counsel removes or alters evidence, the statutory privilege does not bar revelation of the original location or condition of the evidence in question.[8] We thus view the defense decision to remove evidence as a tactical choice. If defense counsel leaves the evidence where he discovers it, his observations derived from privileged communications are insulated from revelation. If, however, counsel chooses to remove evidence to examine or test it, the original location and condition of that evidence loses the protection of the privilege. Applying this analysis to the present case, we hold that the trial court did not err in admitting the investigator's testimony concerning the location of the wallet.

Defendants' other contentions attacking the trial and verdict were fully addressed by the Court of Appeal. We agree with that court's resolution of the issues there presented, and therefore reject defendant's contentions as without merit. (See *People* v. *James* (1977) 19 Cal.3d 99, 118 [137 Cal.Rptr. 447, 561 P.2d 1135].)

We further agree with the Court of Appeal that the judgment against defendants should be modified, and adopt as our own that portion of the Court of Appeal opinion. It reads as follows:

■ "When a defendant commits multiple violations incident to a single objective, conviction is proper for each violation but the defen-

---

[8]In offering the evidence, the prosecution should present the information in a manner which avoids revealing the content of attorney-client communications or the original source of the information. In the present case, for example, the prosecutor simply asked Frick where he found the wallet; he did not identify Frick as a defense investigator or trace the discovery of the wallet to an attorney-client communication.

In other circumstances, when it is not possible to elicit such testimony without identifying the witness as the defendant's attorney or investigator, the defendant may be willing to enter a stipulation which will simply inform the jury as to the relevant location or condition of the evidence in question. When such a stipulation is proffered, the prosecution should not be permitted to reject the stipulation in the hope that by requiring defense counsel personally to testify to such facts, the jury might infer that counsel learned those facts from defendant. (Cf. *People* v. *Hall* (1980) 28 Cal.3d 143, 152 [167 Cal.Rptr. 844, 616 P.2d 826].)

dant may not be punished for more than one. (*People* v. *Miller* (1977) 18 Cal.3d 873, 885 [135 Cal.Rptr. 654, 558 P.2d 552].) The evidence reveals a single course of conduct with one objective, and thus defendants may be punished only for the most serious offense, first degree murder. Conviction for the robbery is appropriate, but the execution of sentence for the robbery must be stayed pending the service of sentence for the murder, such stay to become permanent upon the completion of the murder sentence. (*Id.*, at p. 886.)

■ "Finally, the judgment must be modified in respect to the finding that Meredith used a firearm in the commission of the offense. [¶] The information charged that Meredith was armed with a deadly weapon, to wit, a pistol. The court instructed the jury on being armed with a deadly weapon. The verdict returned by the jury was that Meredith was armed with a deadly weapon, to wit, a pistol. The abstract of judgment states that Meredith used a firearm in the commission of the offense. This finding must be stricken. The allegation and finding that a defendant was armed with a deadly weapon will not support a finding that the defendant used a firearm. (*People* v. *Najera* (1972) 8 Cal.3d 504, 509-510 [105 Cal.Rptr. 345, 503 P.2d 1353].) The judgment may not be modified to include the finding of being armed with a deadly weapon, since being armed with a deadly weapon is an essential element of the offense of first degree robbery. (*People* v. *Hartsell* (1973) 34 Cal. App.3d 8, 12 [109 Cal.Rptr. 627].) Nor may the judgment be modified to make the special finding of being armed with a deadly weapon during the murder, for the terms of Penal Code section 12022 cannot be applied to a conviction where the sentence is life imprisonment. (*People* v. *Walker* (1976) 18 Cal.3d 232, 243 [133 Cal.Rptr. 520, 555 P.2d 306].) Penal Code section 3024 is inapplicable to a life sentence, since the minimum date for parole for a life sentence exceeds the minimum sentence under Penal Code section 3024. (See Pen. Code, § 3046.)[9]"

The superior court is directed to modify its judgment to stay the service of sentence on the robbery convictions, such stay to become permanent upon completion of service of the sentences for murder, and to strike from the abstract of judgment of Meredith the finding of use of a firearm. The superior court is further directed to forward a certi-

[9]"The provisions of the code sections involved in this issue have been amended or replaced by the Uniform Determinate Sentencing Act of 1976 and legislation amending that act. We do not consider the effects of the amendments herein, since that is a matter entrusted to the [Board of Prison Terms], under the terms of the act."

fied copy of the amended abstract of judgment to the Director of Corrections. The judgment, as so modified, is affirmed.

Bird, C. J., Mosk, J., and Newman, J., concurred.

Richardson, J., concurred in the result.

Appellant's petition for a rehearing was denied August 19, 1981, and the opinion was modified to read as printed above.