**UNITED STATES**

v.

**Staff Sergeant Bruce C. PALMER, FR 278–54–8326, United States Air Force.**

**ACM 27209.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 20 Aug. 1989.

Decided 19 Dec. 1989.

Appellate Counsel for the Appellant: Colonel Richard F. O'Hair; Captain Darla G. Orndorff and Mr. William J. Holmes, Virginia Beach, Va.

Appellate Counsel for the U.S.: Colonel Joe R. Lamport, Colonel Robert E. Giovagnoni and Major Terry M. Petrie.

Before HODGSON, SPILLMAN and PRATT, Appellate Military Judges.

## DECISION

SPILLMAN, Judge:

A general court-martial with members convicted the appellant, contrary to his pleas, of rape, sodomy and multiple indecent assaults on his 12–year old stepdaughter in violation of Articles 120, 125 and 134 of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 925, 934. He was sentenced to a dishonorable discharge, confinement for 17 years and reduction to E–1.

Appellant and his family were assigned to Homestead Air Force Base, Florida, in

January 1985 and resided in government quarters on base until June 1988. For most of 1987 and 1988, appellant's wife worked very early in the morning, so the appellant was responsible for getting his stepdaughter, MG, and their nine-year old son ready for school. He bathed them together in the tub while all three were naked. In 1987, when MG was finishing fifth grade, the appellant had talks with her about how she was changing and becoming a woman. Mrs. Palmer was never present during these talks. At the appellant's suggestion he and MG would lie together in his bed or on the couch. MG referred to this activity as "snuggling." These sessions almost always occurred after the morning baths while MG and the appellant were unclothed. Usually the appellant would call MG to his bedroom or to the couch. These morning "snuggle" sessions became almost a daily occurrence and continued for a year or more. Over time the "snuggling" became more intimate, and the appellant regularly rubbed MG's breasts, buttocks and vagina. On one occasion the appellant had MG hold his penis and scratch it, and he regularly asked her to scratch his testicles. On the first occasion that appellant wanted MG to touch him, she wanted to know how many times they would do this, and appellant replied, "Not very much." Generally the appellant remained undressed during and after bathing MG and his son on school day mornings.

On 2 June 1988, a non-school day, the appellant awakened MG and her brother early in the morning. He and MG "snuggled" in his bedroom, and he had her undress and then put ringworm medicine on his buttocks before he told her to bathe. While MG was bathing, the appellant entered the bathroom and joined her, sitting on the edge of the tub. He began rubbing her "like he never had before." Appellant rubbed her chest with his hand, and then grabbed his penis and rubbed it on her chest. He told MG to hold his penis and rub it against her chest; she complied because she was scared. She attempted to back away from the appellant because she didn't like rubbing his penis. Finally the

appellant asked MG if she wanted to do what her mother did. She replied, "I don't know," because she didn't understand what he meant. Appellant told her to place his penis in her mouth and move her head back and forth. MG was reluctant. Appellant coaxed her by saying it would make her feel better and that it wouldn't be so bad. MG moved away from the appellant toward the wall. She didn't want to do it, but the appellant pushed her head toward his penis. It became hard soon after she put it in her mouth. After a few minutes, and prior to ejaculation, appellant told her to stop; he brought his son to the bathroom and bathed both children.

After the baths the appellant asked MG, "Since you did that for me, what do you want me to do for you?" She remained silent but was thinking that she wanted him to stop what he was doing. Moments later the appellant asked, "Do you want me to do what I do to your mom?" Again she was scared to reply, but she finally said, "I don't know." Appellant told her to get her towel and go to his bedroom; once there MG stalled by drying off, and appellant had her close the door. He told her to do what she had done in the bathroom, so she placed his penis in her mouth while they were on the bed.

While they were still on the bed, the appellant put MG into what she called a "frog position" in that she was on her back and her knees were together and drawn upwards over her stomach. He told her to spread her knees, and when she could not, he spread them with his hands. Appellant then put his mouth on her vagina (or "foo foo" as MG referred to it), and she felt his tongue moving inside her. When appellant asked her if she wanted to do this, she gave another equivocating answer. He then asked if she wanted to see sperm, and she said, "I don't know," because she didn't understand about sperm. Appellant scolded her for giving another vague answer, and he returned her to the "frog position." He held his penis in his hand and began rubbing it in and around MG's vaginal area. MG moved his penis away from her vagina, but the appellant returned it and

continued rubbing her vaginal area. At the same time he was explaining to her about the sexual functioning of her vagina. He had her feel her vaginal opening with her hand as he continued rubbing the area with his penis. Apparently the appellant was having difficulty maintaining contact with MG's vagina because he raised her hips and placed a pillow under her. MG felt him pushing hard with his penis, or as she said at trial, "rubbing in there hard", because it hurt her. Appellant asked her if it hurt; she said it did and he stopped. He then masturbated and ejaculated on MG's leg and the bed. Appellant wiped up the sperm with a towel and cleaned MG in the tub.

Soon thereafter, Mrs. Palmer returned home, but MG did not tell her what had happened. Some time earlier MG had told her mother she was having talks with the appellant about how she was changing, and she told her mother not to say anything to him about it because she was scared. Thereafter, the appellant told her that her mother had mentioned they were talking. Based on that incident, MG did not trust her mother.

Almost daily after 2 June 1988, the appellant asked MG if she wanted to do it again (sexual activity), but she declined and stayed away from him. On the afternoon and evening of 6 June, her mother and brother were gone, and MG was in her bedroom studying. Appellant went to her several times and asked her to scratch his testicles and masturbate him, and she did. He also reminded her of what she had done last Thursday, referring to the sodomy and rape, and asked her to do it again. MG told him that a school counselor had said that, "if anybody you don't like touches you, then say no....." And she said no. Later that evening, after MG and her brother were in bed, the appellant called MG to the bathroom. He attempted to draw an analogy for her between her eating his food or taking his money and having sexual activity with him. MG thought he was telling her that it would be alright "to do all those things" with him.

After MG went to sleep that night, she was awakened and saw the appellant sitting naked on the edge of her bed. She was wearing a nightgown and underpants, but soon appellant was under the covers with her and removing her underwear. He put her in the "frog position" and started rubbing his penis between her legs, "and he put it inside of me," referring to her vagina. After a few minutes, the appellant stopped, and then he put his mouth on her vagina. During this entire episode, MG remained as quiet as she could and pretended to be asleep because she was scared. Before appellant left her room, he laid MG's panties over her mid-section. The next morning appellant asked MG why her panties were off, and she said that she must have kicked them off during the night. MG said this because she was scared to let him know she had seen him that night.

The next evening MG told her mother about her relationship with the appellant, primarily the 2 June sodomy, because she was scared "he might do it again." Mrs. Palmer immediately took MG to the security police, and an investigation was initiated that night by the Office of Special Investigations (OSI). A rape protocol was performed on MG at a local hospital, and the results established that MG's hymen was intact and there was no evidence of physical trauma to her genital area. Expert medical testimony further established that a lack physical trauma in the form of lacerations, scrapes or bruises was not necessarily inconsistent with penetration of MG's vagina.

Late on the evening of 7 June the appellant was questioned by two OSI agents. He verbally admitted committing cunnilingus on MG and having her perform fellatio on him. Appellant also explained that he had touched her breasts, vagina and buttocks because he was trying to explain certain matters to her that she could expect in her future relationships with men and boys. He also explained that he was conducting "sensitivity tests," at least initially. Appellant did not think these touchings of MG's body were wrong under the circumstances he described. Regarding the 2

June incident, the appellant admitted he rubbed his penis near MG's vaginal area, but he denied any penetration with either his finger or penis. Appellant also stated that the incident on his bed "went a little too far," and he admitted that almost every day thereafter, he asked MG if she wanted to do it again because he wanted to see how she was affected or what she thought of it. Sometime after the OSI interview, the appellant left a note for his wife in their quarters. In it he apologized for not telling her "when this terrible thing happened," and stating that what he had done had been tearing him up inside.

Appellate defense counsel has assigned numerous errors which, when consolidated, raise the following issues:

## I

Whether the evidence is sufficient, both legally and factually, to support a conviction as to Charges I and III (rape and indecent assault);

## II

Whether the military judge erred by failing to instruct on the defense of mistake of fact as to Charges I and III and whether the "consent" instruction as to Charge I was improper;

## III

Whether the military judge erred by allowing ultimate issue testimony by a clinical psychologist and the appellant's wife, and by failing to give appropriate limiting instructions *sua sponte;*

## IV

Whether the military judge erred by allowing testimony regarding an act of uncharged misconduct over defense objection, and by failing to perform a Mil.R.Evid. 403 balancing test.

## V

Whether the military judge erred by receiving into evidence the appellant's involuntary pretrial verbal admissions.

## I

Appellate defense counsel, in asserting legal and factual insufficiency of the evidence as to Charges I and III, is attacking the evidence of penetration as to the rape allegation (the defense theory at trial) and is contending that MG consented to the acts of sexual intercourse and the indecent assaults by the appellant. As to the issue of penetration, paragraph 45a(c), Part IV, MCM 1984 provides that penetration, however slight, is sufficient to complete the offense of rape. Notwithstanding MG's testimony that the appellant penetrated her vagina with his penis on 2 and 6 June and appellant's admission to the OSI that he rubbed his penis near her vagina on 2 June, counsel contends that the negative medical evidence of trauma to MG's vaginal area, the fact that her hymen is intact and her youth and inexperience in sexual matters raise a reasonable doubt as to penetration. While this argument has some appeal, it is not supported by the evidence of record. Expert medical testimony at trial established that the lack of trauma to MG's vaginal area and her intact hymen represented inconclusive evidence as to lack of penetration. Accordingly, the court members were free to evaluate this evidence, observe MG's demeanor on the witness stand and determine her credibility in light of her relative youth and inexperience. In this regard we note that proof beyond a reasonable doubt does not require evidence that is free from conflict. *United States v. Lee,* 22 M.J. 767 (A.F.C.M.R.1986); *United States v. Steward,* 18 M.J. 506 (A.F.C.M.R. 1984). The test for legal sufficiency of the evidence is whether, considering the evidence of record in the light most favorable to the prosecution, a reasonable fact-finder could find beyond a reasonable doubt the existence of every element of the offense charged. *United States v. Turner,* 25 M.J. 324 (C.M.A.1987); *United States v. Cooper,* 28 M.J. 810 (A.C.M.R.1989); *United States v. Lee, supra.* Applying this standard, we are satisfied there was sufficient evidence to allow the court members to determine beyond a reasonable doubt that penetration occurred.

■ In evaluating the issue of consent as to the rape and indecent assault allegations, it is quite clear from the record that the appellant never employed physical force against MG. In fact, during the 2 June rape, appellant stopped immediately when MG said he was hurting her. Nevertheless, appellate defense counsel's depiction of MG as a willing participant, who freely consented to appellant's sexual advances and the subsequent acts of sexual intercourse, is totally at odds with the evidence. Counsel's argument ignores the parental relationship existing between MG and appellant, and it fails to address the escalating nature of abuse that appellant heaped upon her. First appellant talked to MG about her maturing into a woman; then he touched her as he bathed her, while both were unclothed; next he "snuggled" naked in bed with her; and finally he explored her body, gradually expanding his activities from fondling to sodomy and ultimately rape. Additionally, MG was told not to tell her mother about the talks, and the sexual encounters occurred while Mrs. Palmer was working or otherwise away from their quarters.

In *United States v. DeJonge*, 16 M.J. 974 (A.F.C.M.R.1983), *pet. denied* 18 M.J. 92 (C.M.A.1984) and *United States v. Torres*, 27 M.J. 867, 869 (A.F.C.M.R.1989), this Court addressed the issue of consent by a child to sexual intercourse with one standing *in loco parentis*. We recognized that constructive force may be used to accomplish sexual intercourse, that such force can be subtle and psychological and equivalent to physical force, particularly in the case of a 12–year old child. Further, if it can be shown that a rape victim's will was overcome by fear, coercion or duress, such proof is sufficient to establish the forcible element of rape. As Chief Judge Hodgson observed in *Torres, supra,* the North Carolina Supreme Court explained the nature of intrafamilial sexual abuse in *State v. Etheridge,* 319 N.C. 34, 352 S.E.2d 673, 681 (1987) with great clarity when it observed:

> Sexual activity between a parent and a minor child is not comparable to sexual activity between two adults with a history of consensual intercourse. The youth

and vulnerability of children, coupled with the power inherent in a parent's position of authority, creates a unique situation of dominance and control in which explicit threats and displays of force are not necessary to effect the abuser's purpose.

In evaluating the relationship existing between MG and the appellant, we note that during her testimony MG repeatedly stated that she gave equivocal responses to appellant's advances because she was scared. Only once did she say "no," and that was on the evening of 6 June, just hours before she would be raped for the second time. Furthermore, both MG and her mother testified that the appellant was the primary disciplinarian in the family. MG commented that the appellant was very strict and spanked her and her brother fairly often. We note one other matter. At a preliminary evidentiary hearing conducted outside the presence of the court members, the appellant testified about his apprehension by the security police. During his testimony the appellant stated that he was so large that the apprehending officers were forced to remove his handcuffs to fit him into the rear seat of the police cruiser. Naturally the court members observed the appellant and considered his size and demeanor in evaluating his relationship with MG.

In reviewing the evidence and applying the legal sufficiency test enunciated in *United States v. Turner, supra,* and *United States v. Cooper, supra,* we find that the court members were justified in concluding beyond a reasonable doubt that MG did not willingly consent to having sexual intercourse with appellant and did not consent to the indecent assaults. After considering the same facts and applying the same reasoning to a further argument advanced by appellate defense counsel, we find that the court below was similarly justified in concluding beyond a reasonable doubt that appellant intended to gratify his lust or sexual desires when he committed the indecent assaults upon MG. We are similarly satisfied that the evidence was sufficient to allow the court members to determine be-

yond a reasonable doubt that the appellant was guilty of rape and indecent assault, as alleged in the Specifications of Charges I and III.

In testing for factual sufficiency, the test is whether, after weighing the evidence of record and making allowances for not having personally seen and heard the witnesses, this Court is convinced of the appellant's guilt beyond a reasonable doubt as to the offenses of rape and indecent assault. *United States v. Turner, supra,* and *United States v. Cooper, supra.* After weighing and evaluating the evidence, we are so convinced.

## II

■ In a prosecution for rape or indecent assault, if the evidence reasonably raises the affirmative defense of mistake of fact, the military judge must instruct thereon *sua sponte. United States v. Peel,* 29 M.J. 235 (C.M.A.1989); *United States v. Gamble,* 27 M.J. 298 (C.M.A. 1988); *United States v. Daniels,* 28 M.J. 743 (A.F.C.M.R.1989). In the case *sub judice* the defense theory at trial was that MG was a liar, and that she either made up or exaggerated her allegations against the appellant. Counsel relied on medical testimony regarding lack of trauma and an intact hymen in trying to establish that even consensual intercourse did not occur. On cross examination of MG and her mother, defense counsel pursued motives for MG to lie rather than questioning her recollection of events. Throughout the proceeding counsel vigorously pursued every avenue of attack bearing on MG's credibility. In closing argument defense counsel stressed MG's lack of credibility, the medical evidence and the appellant's denial of sexual intercourse during his OSI interview. However, trial defense counsel failed to request an instruction on mistake of fact as to any allegation. While this court is not bound by the defense theory of

the case, our review of the record convinces us that the mistake of fact defense was not reasonably raised by the evidence at trial. *See United States v. Peel, supra,* and *United States v. Daniels, supra.* Accordingly, the military judge did not err by not instructing the members on mistake of fact as to Charges I and III.

■ Regarding instructional errors, appellate defense counsel also asserts that the military judge committed prejudicial error by giving an incorrect and misleading instruction which presumed proof of essential elements, violated congressional intent and invaded the province of the court members. This assigned error pertains to the military judge's explanatory instruction regarding the definition of rape as requested by trial counsel. It was incorporated into the standard instructions provided in DA Pam 27–9, Military Judges' Benchbook, at paragraph 3–89, and derived from this court's opinion in *United States v. DeJonge, supra.* After properly instructing on the elements of rape the military judge instructed as follows:

> The act of sexual intercourse must have been done by force and without the victim's consent. The lack of consent required, however, is more than mere lack of acquiescence.[1] If a woman fails to make the lack of consent reasonably known by taking such measures of resistance as are called for by the circumstances, the inference may be drawn that she did consent. Consent, however, may not be inferred if resistance would have been useless.[2]

> A rape victim's resistance need only be such as to make a lack of consent and actual resistance reasonably manifest, having regard to her age, her strength and the surrounding circumstances. Resistance of a victim is a relative term and must be considered in accordance with the special circumstances of each case.[3]

1. See MCM, Part IV, paragraph 45c(1)(b) (1984).

2. This portion of the instruction comports with the standard DA Pam 27–9 instruction at paragraph 3–89; it was not objected to at trial nor asserted as error before this court.

3. This language is a quote from *United States v. DeJonge, supra* at 976, citing from *United States v. Henderson,* 4 U.S.C.M.A. 268, 15 C.M.R. 268 (1954). It was not objected to at trial and is not asserted as error before us.

*Consent to sexual intercourse if induced by fear, fright, or coercion, is equivalent to physical force. Accordingly, in the rape of a stepdaughter by her father, it is not necessary to show that she physically resisted. It is sufficient that she submitted under compulsion of a parental command.*[4] Likewise, the acquiescence of a child of such tender years that she is incapable of understanding the nature of the act is not consent. (Emphasis added.) (Footnotes Added.)

Appellate defense counsel contends that the questioned instruction is incomplete and creates a *per se* rule of force and lack of consent in cases of familial child abuse. We disagree. Under R.C.M. 920(a) and Discussion, the military judge should tailor his instructions to fit the circumstances of the case and fairly and adequately cover the issues raised by the evidence. Rather than establishing overt force or threats of violence, the evidence in this case presented a scenario of parental coercion designed to allow appellant to abuse and subsequently sodomize and rape his stepdaughter. To clarify the issues for the court members, the military judge presented an instruction derived from applicable case law which explained the possible effects of the family relationship on the issues of force and consent. We find no possibility of prejudice resulting from this instruction.

### III

■ Appellate counsel asserts that the military judge erred by allowing a clinical psychologist to provide ultimate issue testimony and by failing to give appropriate limiting instructions *sua sponte* regarding that testimony and that of the appellant's wife. During its case in chief, the prosecution presented Major Nancy Slicner who testified over defense objection as an expert regarding sexually abused children. Her testimony related to a child's ability to differentiate between fact and fantasy, the dynamics of an incestuous family situation,

common characteristics of sexually abused children such as school disfunction and depression, differentiating fabricated from legitimate allegations and opinions, and conclusions she drew based on her interviews and other contacts with MG. In conclusion, Major Slicner opined that MG's presentations to her had been consistent with the indicators she would look for in a child who had been sexually abused, but she did not render an opinion regarding MG's truthfulness or whether she would believe MG. Furthermore, Major Slicner did not attempt to profile appellant as a sexual abuser, contrary to appellate defense counsel's assertions.

Consistent with Mil.R.Evid. 702 and the reasoning of *United States v. Gipson*, 24 M.J. 246 (C.M.A.1987), the military judge properly determined that the witness' specialized knowledge of the behavior patterns of sexually abused children would assist the court members in resolving facts in issue. *See United States v. Snipes*, 18 M.J. 172 (C.M.A.1984). Since Major Slicner's testimony·basically characterized the typical behavior patterns of sexually abused children, including those involved in incestuous relationships, and discussed the relative credibility of child victims' recollection of events, it was clearly admissible. Accordingly, we find no possibility of prejudice to this appellant. *United States v. Tolppa*, 25 M.J. 352 (C.M.A.1987); *United States v. Nelson*, 25 M.J. 110 (C.M.A.1987); *United States v. Azure*, 801 F.2d 336, 340 (8th Cir.1986).

During Major Slicner's testimony, civilian defense counsel objected to what he understood to be a line of questioning regarding MG's conforming to the profile of a sexually abused child. The military judge properly overruled the objection and declined to give a requested curative instruction. He also advised counsel: "If you wish later instructions to the court and they're deemed appropriate, we can take that up during an instruction session, defense counsel."

---

**4.** This language is another quote from *DeJonge, supra*, which was objected to at trial and which is asserted as error before us.

At the Article 39(a), UCMJ, session on findings instructions, the military judge informed counsel that he would give the standard instruction on expert witnesses testimony from DA Pam 27–9, Military Judges' Benchbook, paragraph 7–9. Defense counsel did not object to the proposed instruction or request a clarifying or limiting instruction. Under these circumstances, we conclude that counsel's failure to request a limiting instruction as to Major Slicner's testimony constituted waiver in the absence of plain error which we do not find. R.C.M. 920(f); *United States v. Brenton*, 24 M.J. 562 (A.F.C.M.R.1987), *pet. denied* 25 M.J. 393 (C.M.A.1987); R.C.M. 801(g); *United States v. Fisher*, 21 M.J. 327 (C.M.A.1986) and cases cited therein.

■ On direct examination, the appellant's wife testified very briefly about MG telling her of the appellant's misconduct on 7 June, immediately taking MG to the security police gatehouse and other events of that evening. She concluded by authenticating the note appellant left in their quarters sometime after 6 June. On cross examination, civilian defense counsel attacked MG's credibility with sharp questioning as to MG's propensity for lying and by asserting that Mrs. Palmer had told defense counsel that she did not believe MG during a pre-trial interview. Mrs. Palmer's attempts to explain her answers were routinely interrupted by defense counsel. On redirect examination trial counsel asked one question:

TC: Mrs. Palmer do you think your daughter is a liar?
WIT: (WIT began crying hard): No. I think that what she said is true, because I don't think she's an evil little girl. I don't think she'd be making these things up. And what I've had to put up with with both of my children, I don't think they'd be lying.

Clearly this question went beyond the bounds of Mil.R.Evid. 608(a) character evidence; however, trial defense counsel failed to object, and Mrs. Palmer's answer was cumulative of her prior statement that she took MG to the security police when MG told her about the appellant's misconduct. We assume she would not have done so unless she believed MG. Furthermore, trial defense counsel failed to request a limiting instruction regarding this testimony. Under these circumstances, we find no possibility of prejudice to the appellant. Defense counsel's failure to object to the question or request a limiting instruction constituted waiver. Mil.R.Evid. 103(a)(1) and (d); R.C.M. 801(g). Again testing for plain error, we find none. *United States v. Brenton, supra;* R.C.M. 920(f).

IV

■ Over timely defense objection, the military judge allowed MG, on redirect examination, to testify regarding the appellant's showing her a VCR movie in his bedroom which depicted naked men and women. The ruling was made "pursuant to Military Rule of Evidence 404(b), misconduct not charged, on the limited issue of its tendency, if any, to show intent" as to the indecent assault allegation. In describing the movie, MG said it showed nude men and women with one woman on a table and men doing things to her. "And she was talking and cussing and stuff." At one point a man was doing something to the woman, but her long hair covered him. In short, MG thought it was a "horrible" movie. She and appellant were alone when he showed it to her.

Appellate defense counsel asserts that the military judge erred by admitting this testimony over defense objection and by failing to perform the Mil.R.Evid. 403 balancing test. When this testimony was offered, MG had testified, and the escalating nature of the appellant's misconduct with her was spread on the record. Additionally, the military judge was well aware that the appellant's intent was an element of the indecent assault allegation. Finally, the military judge was on notice of the appellant's innocent purpose defense theory based on the prior testimony of the OSI agents, and he could reasonably anticipate they would testify similarly under cross examination before the members. Under these circumstances, we have no doubt that

MG's testimony about this movie was relevant regarding appellant's criminal intent during the lengthy period consumed by his indecent assaults on her. Although MG failed to specify when appellant showed her the movie, the logical implication of her testimony was that it occurred during the eighteen month period prior to trial. That was the time frame covered by her testimony describing appellant's charged misconduct with her. In this regard, any error based on possible remoteness in time was waived by failure to object or clarify this matter through cross examination at trial. R.C.M. 801(g).[5]

In *United States v. White*, 23 M.J. 84 (C.M.A.1986) the Court of Military Appeals enunciated a three step analysis for determining the admissibility of Mil.R.Evid. 404(b) evidence. First, as modified by *United States v. Castillo*, 29 M.J. 145, 151 (C.M.A.1989), citing *United States v. Mirandes–Gonzalez*, 26 M.J. 411 (C.M.A.1988) and *Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), "the military judge must admit the evidence if he concludes that the fact-finder could reasonably find by a preponderance of the evidence that the other misconduct had occurred, even though the judge himself would not make such a finding." Clearly MG's proffered testimony was sufficient to establish by a preponderance of the evidence that appellant showed her the movie.

Second, for what purpose was the evidence offered? As previously discussed, appellant's showing MG a movie depicting naked men and women, as described by MG, was relevant evidence the court members could consider in determining whether he was educating his stepdaughter about young womanhood or whether he was harboring the criminal intent to sexually assault her.

Third, the Mil.R.Evid. 403 balancing test to ensure that the probative value is not substantially outweighed by the danger of unfair prejudice must be satisfied. In applying this rule, trial judges are given considerable leeway in judging the effects of admitting such limited purpose evidence. S. Saltzburg, L. Schinasi, and D. Schlueter, *Military Rules of Evidence Manual* (2d ed. 1986) 342. In view of the relatively minor nature of this uncharged misconduct and its obvious relevance to the appellant's state of mind during the time period covered by the indecent assault allegation, we are satisfied that the military judge did not abuse his discretion in allowing this testimony.

■ Appellate defense counsel's assertion that the military judge failed to perform a Mil.R.Evid. 403 balancing test on the record is correct. In this regard we find that defense counsel's failure to enumerate factors to be considered by the trial judge and his failure to request special findings did not relieve the military judge of his responsibility to perform this test. However, the trial judge advised all parties of the limited purpose for which the testimony was admissible and offered to give a limiting instruction at the appropriate time.[6] He also stated his awareness of case law applicable to this Rule. We are, therefore, confident that the military judge judicially performed the required balancing test and merely failed to articulate his findings on the record. While federal and military case law has encouraged trial judges to make special findings which articulate the rationale for their rulings, generally such findings have not been required. *Military Rules of Evidence Manual* (2d ed. 1986) 344–345; *United States v. Holt*, 21

---

**5.** See *United States v. Mann*, 26 M.J. 1, 5 (C.M.A. 1988) regarding relevance and remoteness in time. Even if the showing of this movie occurred soon after the Palmers moved into base quarters in 1985, this evidence would be relevant. Arguably, use of the movie was but an early step in appellant's efforts to brainwash MG into accepting ever increasing levels of sexual abuse without complaint. Additionally,

MG's entire testimony covered the 18 month time period immediately preceding trial.

**6.** Waived. At the findings instruction Article 39(a) session, defense counsel specifically declined the military judge's offer to give an appropriate limiting instruction. *See United States v. Wray*, 9 M.J. 361 (C.M.A.1980); R.C.M. 920(f).

M.J. 946 (A.F.C.M.R.1986). In this case the record clearly supports admission of the evidence, and we are satisfied that the trial judge did not abuse his discretion in admitting this testimony. Accordingly, we hold that the military judge's failure to articulate his rationale in performing the Rule 403 balancing test did not result in prejudice to the appellant. In this regard, however, trial judges who fail to explain their rationale should anticipate close appellate scrutiny for abuse of discretion.

V

▇ Late on the evening of 7 June 1988, the appellant was apprehended by the security police, handcuffed and transported to the OSI for questioning. The OSI agents made him comfortable and allowed him freedom of movement because he was reportedly claustrophobic and appeared to be nervous. The agents advised appellant of his rights under Article 31, UCMJ, 10 U.S.C. § 831, including his right to consult with counsel, and questioned him about his relationship with MG.

At a preliminary evidentiary hearing, the appellant contended that he told the agents he *thought* he understood his rights. He also stated that when he was advised of his right to a lawyer, he asked if he needed one. According to the appellant, the agents never answered this question or further explained his rights. Appellant did admit, however, that he never asked for a lawyer during the interview even though he wanted a lawyer or someone else to be there. Appellant also testified that he repeatedly asked, "Should I be talking to you?" and "Shouldn't I have someone here?" during the interview. According to appellant, the agents replied that they were there to help him; there was no need to be nervous; they could not promise him anything, but they would help all they could if he talked to them. At trial and before us, the appellant contends that he did not voluntarily waive his right to remain silent or to have a lawyer present.

Both OSI agents testified at the hearing, and both agreed that appellant was fully advised of his rights under Article 31, including his right to counsel. They further agreed that appellant acknowledged understanding his rights and voluntarily waived his rights to remain silent and to counsel. Both agents recalled that the appellant inquired specifically about whether he should be talking to them, and if he should have someone else present. However, the agents insisted that appellant's questions about being interviewed were raised after the appellant made most of his admissions of misconduct with MG. The agents admitted telling the appellant they were there to help him, but they never said this in response to appellant's questions about having someone there to assist him. Both agents agreed that the appellant never asked for a lawyer during the interview, but that late in the session, he asked about having someone else present on three or four occasions. On each occasion the agents asked whom he would like to have present, and appellant gave no definite responses. Finally, when the appellant asked to talk with his first sergeant, the interview was terminated immediately, and the first sergeant was made available to the appellant.

The military judge made detailed findings of fact which concluded that the appellant affirmatively waived his right to remain silent and to the assistance of counsel, and that he voluntarily and knowingly submitted to questioning. The judge specifically found that the appellant, after making some admissions, inquired of the agents as to whether he should talk with someone else or whether someone else should be present. Since the trial judge saw and heard the witnesses for both sides, he was in the best position to evaluate and judge their credibility. By denying this motion, he found the OSI agents to be more credible than the appellant on disputed questions of fact. We further find that the OSI investigators properly attempted to clarify appellant's equivocal or ambiguous requests for counsel or assistance by asking whom he wanted to talk to or see. Their questions were not designed to mislead the appellant or to dissuade him from discontinuing the questioning. Fur-

**940**

thermore, they were not designed to coerce or intimidate appellant into waiving his rights to counsel or to terminate the interview.[7] We, therefore, find nothing in the record of trial to warrant overturning the military judge's ruling.

In accordance with Article 66(c), UCMJ, 10 U.S.C. § 866(c) we have examined the record of trial and, like the court below, are convinced beyond a reasonable doubt that the appellant is guilty of all charged of-fenses. Accordingly, the findings of guilty and the sentence are

AFFIRMED.

Chief Judge HODGSON and Judge PRATT concur.

---

7. See *United States v. Fouche,* 833 F.2d 1284 (9th Cir.1987) *cert. denied,* 486 U.S. 1017, 108 S.Ct. 1756, 100 L.Ed.2d 218 (1988), regarding an agent's ability to question a suspect after an equivocal (or ambiguous) request for counsel. Such questioning must be limited to an attempt to clarify the request and must not be coercive or designed to intimidate the suspect into waiving his right to counsel or to terminate the interview. *Citing Nash v. Estelle,* 597 F.2d 513 (5th Cir.1979) *cert. denied* 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409 (1979). *See also Robtoy v. Kincheloe,* 871 F.2d 1478 (9th Cir.1989).