UNITED STATES

v.

**Master Sergeant Robert E. RHEA, FR 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, United States Air Force.**

**ACM 27563.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 19 Oct. 1988.

Decided 19 Jan. 1990.

Appellate Counsel for the Appellant: Colonel Richard F. O'Hair and Captain Bernard E. Doyle, Jr.

Appellate Counsel for the United States: Colonel Joe R. Lamport, Colonel Robert E. Giovagnoni, Major Terry M. Petrie and Major Kathryn I. Taylor.

Before HODGSON, FORAY and MURDOCK, Appellate Military Judges.

## DECISION

HODGSON, Chief Judge:

Yvonne[1] Rhea is the appellant's stepdaughter and was born in Thailand on 26 November 1967. She has no recollection of her natural father, who was a Thai national, and lived with her maternal grandparents in a small village until she was nine years old. In January 1976, while sta-

---

1. This is not the girl's real name.

tioned in Thailand, the appellant married Yvonne's mother. Yvonne left Thailand in 1977 and joined her mother and the appellant at Charleston Air Force Base. Three years later the appellant was assigned to Homestead Air Force Base. Yvonne was happy living in America because she lived so much better here than in her grandparents' village. Additionally, the appellant was good to her and gave her "about anything [she] wanted."

The area around Homestead has a large Thai community and when Yvonne's mother was not working, she spent considerable time away from the house with her Thai friends. In 1980, when Yvonne was thirteen, the appellant began to lie in bed with her, and tickle and french kiss her. Later, he began caressing her breasts, stating he was examining her for cancer.

Between December 1984 and July 1985, while he was stationed at Homestead, the appellant began to have sexual intercourse with his stepdaughter. This happened on numerous occasions and always started the same way—they would begin making the bed and the appellant would begin kissing his stepdaughter. He would have her disrobe and they would get into bed together nude. Ultimately, they would have sexual intercourse. Yvonne testified that she told him she did not want to have sexual relations, but he would plead and argue with her interminably and eventually "would still have his way." The sexual intercourse occurred when Yvonne's mother was not at home. She never told her mother what the appellant was doing because they were not close, and she was fearful that her mother "would try to kill [the appellant] or something like that. She would have gone crazy." Further, she feared that if her stepfather's conduct were discovered she would be sent to a foster home or back to Thailand.

During the summer of 1985, the appellant was reassigned to Sembach Air Base, Federal Republic of Germany. His wife, Yvonne's mother, indicated she was not going to accompany him to Germany and she moved into an apartment. Initially, Yvonne decided to remain with her mother,

but she changed her mind when the appellant promised they would live separate lives like father and daughter and he would not touch her sexually. He kept his promise during the move and for the first several months after they arrived in Germany. However, in October, just before his heart attack, the appellant renewed his sexual demands and again began having sexual relations with his stepdaughter. When she reminded the appellant of his promise, he said "[I] need [you] to do things for me [and] ... when [I] get [my] heart surgery done ... [I will not] need [you] any more." Once again Yvonne initially refused to have sexual intercourse with the appellant, but his incessant jawboning lead her to give in to his demands rather than face a continuing argument.

In January 1986, the appellant travelled to Walter Reed Army Medical Center, Washington, D.C. for heart surgery. His stepdaughter accompanied him, and the two of them returned to Germany in late February. About a month later, the appellant again requested sexual favors from his stepdaughter saying that, "he couldn't help it ... [and] he needed [her] to do this." Sometimes when she asked him not to, he would not, but would, instead, start to cry. During this period, in addition to sexual intercourse, he had her commit fellatio on him and masturbate him. Many of these incidents occurred after the appellant had been drinking.

In May 1986, the appellant offered to buy his stepdaughter a stereo if she would agree to give him six "lovings," i.e., episodes of sexual intercourse. Yvonne recorded each sexual encounter on a calendar entitled "Dogs Are People Too" which she kept in her room. After six "lovings" the appellant bought her a stereo.

Yvonne met her present husband, who is in the Air Force, in April 1987. At the time he worked for the appellant who was jealous of the relationship and did not want it to continue. During the summer of 1987, the appellant's sexual demands, which had abated over the previous 12 months, increased. It was during this period that Yvonne agreed to have sexual intercourse

with her stepfather on a weekly basis if "he would be nicer" to her boy friend.

On the weekend of 10 October, the appellant, his stepdaughter and her boy friend, were together at a local gasthaus. During the evening, Yvonne became slightly intoxicated. Her future husband took her to his apartment and then returned to the gasthaus. Later, he went back to his house and went to sleep. At approximately 2300 hours, the appellant came to the house, drunk, broke down the door, and assaulted his stepdaughter and her future husband.

During his testimony, the appellant categorically denied any sexual misconduct with his stepdaughter pointing out that his heart condition made any sexual activity by him extremely dangerous. He acknowledged that he did not like his stepdaughter's boyfriend and stated that he lost control when he went to the apartment and saw them in bed together.

Contrary to his pleas, the appellant was convicted of rape, sodomy, indecent acts, assault, and being drunk and disorderly. He was sentenced to a bad conduct discharge, five years confinement, total forfeitures, and reduction to airman basic.

## I

The initial issue we address is one of first impression within the military justice system: to what extent is an attorney, in possession of evidence that incriminates his client obligated to submit it to the prosecution *sua sponte?*

In early October 1987, allegations of sexual misconduct by the appellant with his stepdaughter surfaced. Subsequently, in late November, his appointed military defense counsel suggested that he gather "any documents, letters, papers, books, those sort of things" that his stepdaughter had left behind when she moved out that might explain her motive for making the allegations against him. They examined the materials and found nothing helpful to the case.

It was during the pretrial investigation on 8 January 1988 that Yvonne Rhea stated that the appellant bought her a stereo in return for her having sexual intercourse on six occasions. She stated that each time it occurred she marked on a calendar she kept in her room in the appellant's house. The government obtained authorization to search the appellant's house, but did not find the calendar.

Later, defense counsel searched the box of materials the appellant had left with them, and found the calendar that Yvonne had described.

Since defense counsel became concerned that the materials the appellant had stored with them contained evidence of a crime, they immediately contacted their respective state bars [i.e., Idaho and Virginia] for guidance. Both state organizations suggested that a ruling be sought from the trial judge as to whether disclosure was required. However, both implied that disclosure was probably necessary.

On 4 March 1988, appellant's counsel requested an *ex parte* hearing before the trial judge. After being apprised of the situation, he issued an order directing the defense to turn over the calendar to the government. When both counsel complied with the Court's order, the appellant asked that they be relieved and new counsel assigned. This was done. Additionally, the trial judge recused himself, and a new judge was appointed.

At trial the newly appointed military counsel moved to suppress the introduction of the calendar. After the newly-appointed judge denied the motion, the appellant petitioned this Court for a Writ of Extraordinary Relief which was denied on 31 May 1988. *See Rhea v. Starr,* 26 M.J. 683 (A.F. C.M.R.1988).

The appellant now claims he was denied effective assistance of counsel when his military attorneys voluntarily released his stepdaughter's calendar to the prosecution. He makes a multi-pronged argument in support of his position.

■ First, he asserts that military judges have no authority to rule on the ethical responsibilities of counsel appearing before them. The appellant suggests that since the Air Force has never adopted the

American Bar Association (ABA) Code of Professional Responsibility which includes the Disciplinary Rules, the trial judge could not lawfully issue an order defining the ethical responsibilities of counsel. We disagree. Military judges have the inherent power to resolve issues of the ethical obligations of counsel. *Accord United States v. Herod*, 21 M.J. 762, 763 n. 1 (A.F.C.M.R. 1986); *see also* Air Force Regulation 111–1, *Military Justice Guide*, 30 September 1988, para. 1–8 applying the ABA Standards for Criminal Justice to military courts-martial. We also note that on 4 December 1989, The Judge Advocate General of the Air Force promulgated the Air Force Rules of Professional Responsibility which are directly adapted from the ABA Rules with important contributions from our sister services. These rules are binding on all counsel involved in military justice matters which take place after their promulgation.

■  Next, appellate defense counsel argue that the order directing appellant's counsel to release the calendar to the prosecution was invalid as it emanated from an unauthorized *ex parte* hearing. Appellate counsel cite *United States v. Chavira*, 25 M.J. 705 (A.C.M.R.1987) and *United States v. Dean*, 13 M.J. 676 (A.F.C.M.R.1982), as prohibiting all *ex parte* hearings regardless of their purpose. Again we disagree. In *Chavira* and *Dean* the *ex parte* communication was with the trial counsel in the absence of the defense counsel. The situation here is entirely different. In the case before us, defense counsel possessed evidence given to them by their client that legally and ethically they might have to disclose. Following the guidance from their state licensing bodies, they submitted the question to the trial judge. If opposing counsel had been present he would have been aware of the existence of the calendar even assuming, *arguendo*, that disclosure was not required. In such a case, having both parties present would have undermined the purpose for which the hearing was held—resolution of whether certain evidence must be disclosed to the prosecution. An *ex parte* hearing is the only logical solution. The law does not demand foolish acts. In our view the trial judge acted properly in allowing an *ex parte* hearing on the matter. His permitting such a hearing was discretionary and within the intent of R.C.M. 701(g)(2) which governs protective and modifying orders.

■  The ABA Model Code of Professional Responsibility, Disciplinary Rule 7–102, Representing a Client Within the Bounds of the Law, states:

\*     \*     \*     \*     \*     \*

(A) In his representation of a client a lawyer shall not: . . .

(3) Conceal or knowingly fail to disclose that which he is required by law to reveal.

(7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent.

Notwithstanding the above provisions, appellate defense counsel contend that the appellant's first two military defense counsel breached the attorney-client privilege when they voluntarily disclosed the existence of potentially damaging evidence to the trial judge, and later provided it to the prosecution albeit under court order. They further suggest that trial defense counsel should not have obeyed the trial judge's order that the evidence be given to the prosecution. We disagree. We will leave for another time a discussion of the sanctions that might be applied to an individual who willfully disregards a court order.

Appellate defense counsel ask that we chastise the two lawyers who first represented the appellant for their conduct in seeking guidance as to their ethical obligations. To the contrary, we commend them for their actions. It is apparent that these military defense counsel were aware of the special responsibility they held as officers of the court to insure that the military justice system is administered fairly and justly. We would all do well to remember that attorneys are advocates and not *alter egos*. The counsel here were faced with what they considered to be a serious ethical problem. They sought advice first from their state bar associations. They followed the advice they received by

informing the trial judge of the situation, and complying with his ruling requiring disclosure of the evidence. Further, the legal obligation of a defense counsel who comes into possession of physical evidence related to a criminal case should be self-executing, and a court order should not be required to enforce it. *People v. Superior Court (Fairbank)*, 192 Cal.App.3d 32, 237 Cal.Rptr. 158 (1987). The attorneys' conduct was entirely proper and the appellant's assertion that he was denied effective assistance of counsel is without merit.

■ Finally, we turn to the question of whether the trial judge was correct when he ordered that the calendar be released to the prosecution. The "attorney-client privilege" prevents a lawyer from being compelled to produce a client's document which predates the attorney-client relationship only *if* the client himself would be privileged from producing the document. R.C.M. 502; *see State ex. rel. Hyder v. Superior Court of Maricopa County*, 128 Ariz. 253, 625 P.2d 316 (1981); *see also McCormick's Handbook on the Law of Evidence*, ch. 10, section 89, at 184–185 (2d Ed.1972) and 8 *Wigmore, Evid.* (McNaughton Rev.1961), section 2307. Thus, not all papers in an attorney's possession are immune under the attorney-client privilege, and writings not otherwise privileged do not become so by merely giving them to an attorney. *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); *In re Ryder*, 381 F.2d 713 (4th Cir.1967); *Matter of Victor*, 422 F.Supp. 475 (D.C.N.Y.1976); *Duplan Corporation v. Deering Milliken, Inc.*, 397 F.Supp. 1146 (D.C.S.C.1974); *Recker v. Gustafson*, 279 N.W.2d 744 (IA.1979).

■ The question here is not self-incrimination within the meaning of the Fifth Amendment. The notations on the calendar were his stepdaughter's, not the appellant's. Further, the calendar was hers, not his. Since the calendar and its writings [2] were not privileged and could have been seized from the appellant pursuant to a

search authorization, storing the calendar with the attorney did not make it privileged. We hold that the calendar was not a privileged attorney-client communication, and the trial judge properly admitted it. Our decision today follows the federal rule and that of numerous state jurisdictions. *Clutchette v. Rushen*, 770 F.2d 1469 (9th Cir.1985), *cert. denied* 475 U.S. 1088, 106 S.Ct. 1474, 89 L.Ed.2d 729 (1986) (Defense attorney who possessed receipts showing client had car reupholstered immediately after murder with which client was charged had an obligation to give them to the State after the attorney had examined them); *In re Ryder*, 263 F.Supp. 360 (E.D. Va.1967), *aff'd* 381 F.2d 713 (4th Cir.1967) (Concealment of stolen money and a weapon used in an armed robbery); *Hitch v. Pima County Superior Court*, 146 Ariz. 588, 708 P.2d 72 (1985) (Attorney who had victim's wristwatch was required to give it to the State, even without a *subpoena* ); *People v. Meredith*, 29 Cal.3d 682, 175 Cal. Rptr. 612, 631 P.2d 46 (1981) (Attorney whose private investigator obtained victim's partially burnt wallet was obligated to turn it over to the police); *People v. Nash*, 418 Mich. 196, 341 N.W.2d 439 (1983) (Attorney was required to turn murder weapon over to the State); *People v. Swearingen*, 649 P.2d 1102 (Colo.1982) (Forged deed of trust held by defense counsel not within attorney-client privilege); *Commonwealth v. Stenbach*, 356 Pa.Super. 5, 514 A.2d 114 (1986) (Physical evidence of crime in possession of defense attorney not subject to attorney-client privilege). The following law review articles merit reading on this issue: "People v. Meredith: The Attorney–Client Privilege and The Criminal Defendant's Constitutional Rights," 70 California Law Review 1048 (July 1982); and "Ethics, Law & Loyalty: The Attorney's Duty to Turn Over Incriminating Physical Evidence," 32 Stanford Law Review 977 (May 1980).

## II

■ On 18 October, while the members were deliberating on findings, one of the

---

**2.** In *United States v. Warren*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), the Supreme Court abolished the distinction between "fruits

and instrumentalities of a crime" and "mere evidentiary items" for the purpose of issuing a search warrant.

appellant's trial defense counsel received a phone call from an unidentified woman. The caller indicated that she was privy to a conversation that took place in the hallway during the trial between a court member and his wife. When she declined to identify herself or give any details about the conversation, the defense counsel told her he could do nothing and suggested she contact the military judge. The defense counsel did not tell the trial judge about the phone call.

The appellant was sentenced on 19 October 1988. Two days later, an anonymous letter was received by the area defense counsel at Sembach Air Base stating that the son of a courtmember had told school friends that his parents had discussed the case during the trial and both thought the appellant was guilty.

In a post-trial 39(a) session the appellant moved for a mistrial based on the unauthorized communication between the courtmember and his wife. *See* R.C.M. 803 and 915. After hearing evidence on the matter, the trial judge denied the motion noting:

> I fail to understand why the defense chose not to inform me of the phone call when it was received, and let me decide if some inquiry needed to be made concerning unauthorized communications.
>
> The defense received the call while the jury was deliberating. Those deliberations could have been stopped, and the court members could have been individually *voir dired*, and remedial action could have been taken, if necessary. Instead the defense took the position that they could do nothing, and suggested that the caller call the judge, which the caller did not do.
>
> Why the defense took this position and chose not to inform me when it received the call is beyond me. But I think such a position is ill advised and very risky, particularly under the recent case law.

The trial judge's observation is well taken. While a member's misconduct may result in reversible error, if the misconduct becomes known to a party during the progress of a trial, he must call it to the attention of the court, and if he fails to do so he has waived that right and cannot later assert such error. *United States v. Wolfe,* 8 U.S.C. M.A. 247, 24 C.M.R. 57 (1957); *United States v. Martin,* 19 C.M.R. 646 (A.F.B.R. 1954), *pet. denied* 19 C.M.R. 413 (C.M.A. 1955); *see also Gray v. Hutto,* 648 F.2d 210 (4th Cir.1981). By waiting until the trial was over before bringing the alleged member misconduct to the trial judge's attention, the appellant has waived the right to complain.

### III

Immediately after the appellant's assault on his stepdaughter and her boy friend on 10 October, she told law enforcement investigators that he had been sexually abusing her since she was 12 years old. She also told investigators that the appellant had a collection of pornographic movies, magazines, and books that he kept in their apartment. This information, together with an opinion from a clinical psychologist that a majority of child sex offenders possess some form of pornographic literature that is used to arouse their sexual desires, formed the basis of a search authorization granted on 15 October 1987.

This search disclosed three paperback books in the appellant's bedroom that vividly and obscenely described incestuous behavior and sexual assaults on young girls by older men.

■ The appellant argues that the commander lacked sufficient facts to authorize the search that resulted in the seizure of the books described above. He contends that the commander was not given any information that made possession of pornography relevant to the alleged offense. We disagree. The commander was told that the appellant had been sexually abusing his stepdaughter for the past five years, and that it is a common occurrence for individuals who engage in such behavior to possess materials that sexually excite them. The search authorization was limited to the seizure of items having a "direct link to the charged offenses" that dealt with "adults or children". A fair reading of the affidavit supporting the search authorization and the authorization itself pro-

vides sufficient nexus between the items searched for and the crime of which the appellant was suspected.

We also find that the commander had sufficient grounds to conclude that the appellant possessed the items. The individual providing the information was not a routine informant [i.e., a member of the criminal community] but was the victim of the alleged crime who had recently seen the materials in the home. Information from such sources is given preferred status. *United States v. Watford*, 14 M.J. 719 (A.F.C.M.R. 1982). Finally, a determination that probable cause exists to authorize a search is entitled to a presumption of validity. The trial judge properly overruled the suppression motion. *United States v. Ozanich*, 27 M.J. 585 (A.F.C.M.R.1988); *accord Clifford v. State*, 474 N.E.2d 963 (Ind.1985).

The ultimate issue here is the relevancy of the paperback books to the charged offenses. Since it is not a crime to possess sexually explicit materials, *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), what is the basis for their admissibility? Mil.R.Evid. 404(b) permits the prosecution to offer evidence of other crimes, wrongs, or acts for a specific purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or plan. *United States v. Brooks*, 22 M.J. 441 (C.M. A.1986). This Rule like its Federal counterpart, has been highly litigated. In a nutshell, the evidence cannot be offered simply to prove that the accused is a bad person. *United States v. Reynolds*, 29 M.J. 105 (C.M.A.1989); *United States v. Jones*, 25 M.J. 567 (A.F.C.M.R.1987).

■ Evidence that is not admissible in the case in chief may become so in rebuttal by the choice of defense tactics. *United States v. Rodriguez*, 28 M.J. 1016 (A.F.C. M.R.1989). Here, after the appellant specifically denied any sexual misconduct with his stepdaughter, the prosecution offered the materials found in his bedroom to provide a motive for his actions. Motive is that which incites or stimulates a person to act. It is a state of mind tending to show the basis for that individual's behavior.

*United States v. Lips*, 22 M.J. 679, 682 (A.F.C.M.R.1986), *pet. denied* 24 M.J. 45 (C.M.A.1987). The possession of sexually explicit materials describing in detail the sexual exploitation of young girls by older men and the vivid depictions of incestuous conduct is an indication of the appellant's emotional penchant for the type of sexual behavior with which he was charged. Further, the admission of the books corroborates the stepdaughter's testimony by providing a motive for the appellant's actions. Such evidence is relevant because most sex offenses involving family members occur in private and the determination of witness credibility is a crucial factor. *United States v. Lips, supra.*

Absent a clear abuse of discretion, a trial judge's ruling on the admissibility of rebuttal evidence will not be disturbed. *United States v. Rodriguez, supra.* Here, the trial judge concluded that the probative value of the rebuttal evidence substantially outweighed the danger of unfair prejudice. *See* Mil.R.Evid. 403. We find no abuse of discretion in his ruling.

IV

Appellate defense counsel invited our attention to the appellant's trial motion in *limine* to prevent a clinical psychologist from testifying on the concept of parental duress as it pertains to rape in intrafamilial sexual abuse cases. At trial the defense maintained that the proffered testimony was without any scientific basis and substantially prejudiced the appellant's right to a fair trial.

■ We have examined the challenged testimony and find it is probative within the meaning of Mil.R.Evid. 401, 402 and 702. There is no question that the witness's testimony assisted the fact finder in understanding an important trial issue, i.e., sexual intercourse resulting from parental coercion. *United States v. Reynolds, supra; accord United States v. Carter*, 26 M.J. 428 (C.M.A.1988); *see also United States v. Nelson*, 25 M.J. 110 (C.M.A.1987). We also note that the witness gave no opinion as to the victim's truthfulness or

credibility. *See United States v. Tolppa*, 25 M.J. 352 (C.M.A.1987).

## V

We have examined the record of trial, and like the court below, we are convinced beyond a reasonable doubt that the appellant is guilty of the offenses alleged. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Palmer*, 29 M.J. 929 (A.F.C.M.R. 1989); *United States v. Torres*, 27 M.J. 867 (A.F.C.M.R.1989). For the reasons stated the findings of guilty and the sentence, both being correct in both law and fact, are

AFFIRMED.

Senior Judge FORAY and Judge MURDOCK concur.