JOURNAL ENTRY AND OPINION OF DECISION
Bobby Johnson appeals from a judgment of the common pleas court entered pursuant to a jury verdict finding him guilty of aggravated murder due to his involvement in the death of Clifford Beller. He assigns the following as error for our review:
 I. THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE DEFENDANT-APPELLANT'S CONVICTION FOR AGGRAVATED MURDER AND THE VERDICT WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.
 II. APPELLANT'S TRIAL COUNSEL WAS INEFFECTIVE FOR REVEALING PRIVILEGED COMMUNICATIONS AND THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE ADMISSION OF COMMUNICATIONS BETWEEN APPELLANT AND HIS ATTORNEY, THEREBY VIOLATING APPELLANT'S ATTORNEY-CLIENT PRIVILEGE AND HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.
 III. THE TRIAL COURT ERRED IN PERMITTING EVIDENCE OF OTHER ACTS OR WRONGS, THEREBY DENYING APPELLANT JOHNSON HIS RIGHT TO DUE PROCESS AND TO A FAIR TRIAL AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16
OF THE OHIO CONSTITUTION.
 IV. THE ADMISSION OF GRUESOME, CUMULATIVE AND INFLAMMATORY CRIME SCENE AND AUTOPSY EVIDENCE VIOLATED OHIO RULE OF EVIDENCE 403(A) AND PREJUDICED DEFENDANT-APPELLANT'S RIGHT TO A FAIR TRIAL.
 V. PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT DEPRIVED THE DEFENDANT-APPELLANT OF HIS RIGHT TO DUE PROCESS.
Having reviewed the record and the legal arguments of the parties, we affirm the judgment of the trial court. The apposite facts follow.
Surenda Ramjit shot Clifford Beller three times in the back of the head. The State of Ohio also charged Bobby Johnson with the murder. Johnson associated with a group of young people who lived in the area of Bedford, Northfield and Macedonia, Ohio, including co-defendant Ramjit. Johnson eventually became involved in a rap group that consisted of some friends and family members, including his cousin, Laquan Stowers. The members of the group occasionally funded their enterprise by selling marijuana. Stowers was entrusted with the proceeds of the sales; however, sometime in the later part of 1998, Stowers used a portion of the group's money to have his automobile repaired. This caused a rift between the cousins, and their various friends were forced to choose sides in the dispute. Ramjit remained loyal to Johnson; Beller became more closely associated with Stowers.
On the evening of January 12, 1999, Stowers and his friends visited the home of Mary Ellen MacGregor, one of the female members of their clique. Her house was located across the street from Johnson's home. Beller, one of the few in the group who had the use of a vehicle, brought with him Stowers and two other friends, Clarence Harris and Michael Knapp. Sometime thereafter, Beller's best friend, Sean Alvis, arrived.
At some point during that evening, the group wanted to smoke marijuana, so Knapp volunteered to go across the street to ask Johnson to sell him marijuana. Upon his arrival at Johnson's residence, Knapp observed Ramjit also was there. Johnson refused to sell him any marijuana because he was aware Knapp associated with Stowers. Knapp still was engaged in his effort when Harris arrived at Johnson's door to buy a blunt. Harris was Stowers' closest ally; thus, his audacity at taking this action angered both Johnson and Ramjit. Ramjit shouted at him, ordering him off of Johnson's property.
Ramjit's belligerence sparked Harris's anger as well as his retreat. When he and Knapp returned to MacGregor's garage where the group had gathered, Harris informed Stowers of the reception he had received and told Stowers he wanted to fight Ramjit. They all discussed the matter for a time, then noticed Johnson and Ramjit emerge from the house.
As the two approached Johnson's Cadillac, parked on the street, Harris ran outside and started arguing with Ramjit and Johnson. Stowers and the other members of his clique, including Beller, followed. Harris removed his shirt in preparation for a fight with Ramjit. Ramjit, however, refused to engage with the larger and more powerful Harris. Instead, he stared at Stowers while Harris insulted him and Johnson.
Johnson and Ramjit eventually left in Johnson's Cadillac and afterwards, Stowers' group continued with their party for a time. Beller then provided a ride home to most of the young men.
After Beller dropped Harris off, Beller and Sean Alvis proceeded to a restaurant where they applied for employment. Upon being informed they could start working the following day, they proceeded to Alvis's house to attend a birthday party. The two were there for approximately an hour when Johnson telephoned. Johnson spoke to Alvis only briefly before requesting Beller. Following the telephone conversation, Beller informed Alvis he had to leave to pick up some money that Ramjit owed him. Beller first drove Alvis to the apartment complex where he and Beller had been staying with friends, then drove away from there alone at approximately 11:00 p.m., turning his vehicle left onto Sagamore Road rather than using the more typical right turn, which led to Northfield Road.
At approximately 1:20 a.m. on January 13, 1999, Walton Hills Police Sergeant David Choba was on routine patrol westbound on Sagamore Road when he observed a vehicle parked in the Metroparks picnic area. The unlit vehicle was not parked in a normal parking space. In view of the hour and the extremely inclement weather, Choba decided to investigate. He engaged his cruiser's video camera before exiting.
As Choba approached the vehicle, he observed what appeared to be steam coming off the vehicle, leading him to believe it recently had arrived in the lot. He also noticed what appeared to be two bullet holes in the front windshield of the vehicle. Upon closer observation, he saw the driver of the vehicle, later identified as Clifford Beller, sitting back in his seat with his head slumped slightly to his right. Beller's head was bloody. At that point, Choba radioed for additional assistance and notified ranger headquarters of the occurrence of a possible homicide on Metroparks property.
Subsequent testimony indicated the parking area had been empty within the hour prior to the discovery of Beller's vehicle. Although investigation of the case quickly was assigned to Ranger Sergeant John Manzatt, the hazardous road conditions prevented Manzatt from arriving on the scene until approximately 2:30 a.m. While Choba waited, he took some photographs and performed some cursory investigation of the crime scene. Some tire tracks, footprints, and blood spots were found in the area of the vehicle and the parking lot. A check of the vehicle's license, moreover, provided the victim's name.
Thereafter, Manzatt took additional photographs, obtained samples of the blood spots and also located the murder weapon buried in the snow a short distance from Beller's vehicle. The subsequent autopsy of Beller's body indicated he had been shot with a .40 caliber semiautomatic handgun at least three times in the back of the head at close range.
Some of the bullets shot from the handgun had also struck the interior of Beller's vehicle; one was lodged in the steering wheel.
Forensic analysis of the body and the vehicle further indicated a significant amount of blow back of the victim's blood and brain matter had occurred during the shooting; thus, the perpetrator of the crime, who had been in the rear passenger seat, would have been marked with it. During the daytime hours of January 13, 1999, Manzatt began interviewing Beller's family and friends.
At approximately 11:30 a.m. that day, Ramjit telephoned a friend to request a ride home from Johnson's house. Johnson thereafter was observed cleaning both the exterior and the interior of his Cadillac, which he had placed inside the home's garage.
On January 14, 1999, Manzatt interviewed Johnson in connection with the murder. During that first interview, Johnson stated he and Ramjit had been at Slam Jams from 5:00 p.m. to 8:00 p.m. on the night of the shooting. After he left, Johnson said he stayed at home the rest of the night and that he left Ramjit at Slam Jams with his brother.
The next morning, Johnson's mother contacted Manzatt to arrange another interview with her son. During that interview, Johnson informed police the two left Slam Jams together and he dropped Ramjit off. Shortly thereafter, he went to a Clarkwood Gas Station in Oakwood Village and Ramjit and Beller pulled up and Ramjit told him to follow Beller to the park because he had to meet someone to pay Beller the money Ramjit owed him. He further stated when he pulled in the picnic area, his vehicle got stuck in the snow and Beller pushed him out. As he began to drive away, he heard several shots. Ramjit then entered the passenger side of his car and told him to drive away. Johnson drove to his house and stayed there all night. He stated he did not ask Ramjit any questions and Ramjit told him if you say anything I'll kill you too.
The grand jury indicted Johnson, the driver, for aggravated murder with two firearm specifications and he retained an attorney to represent him. Johnson communicated to his attorney information about the shooting, and specifically, told him the location of a pair of blue latex gloves, the existence of which had been unknown to the police. On January 26, 1999, Johnson's counsel relayed this information to Manzatt. Counsel informed Manzatt that Johnson had told him that as he and Ramjit were driving away from the parking lot, Ramjit threw a pair of blue latex gloves out the window of the car. As a result, Manzatt located the gloves on the side of the road near the crime scene. One of the gloves tested positive for the victim's blood. The gloves were found on the east side of the parking lot and the south side of the road, which would be the passenger's side of the vehicle if it had been traveling east.
Following a lengthy jury trial, Johnson was found guilty of aggravated murder and not guilty of either specification. The court sentenced him to a term of life imprisonment without the possibility of parole for 20 years.
In his first assignment of error, Johnson alleges there was insufficient evidence to support a conviction for aggravated murder and that the verdict was against the manifest weight of the evidence.
Regarding the sufficiency of the evidence against Johnson:
 The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses.* * *.[1]
The test for sufficiency of the evidence raises a question of law to be decided by the court before the jury may receive and consider the evidence of the claimed offense. In State v. Jenks[2], the court stated:
 An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence submitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (Citations omitted.)
In this case, the state assumed the burden of proving Johnson's guilt beyond a reasonable doubt for the crime of aggravated murder. Aggravated murder is defined in R.C. 2903.01 as follows:
 (A) No person shall purposely, and with prior calculation and design, cause the death of another * * *.
In its case-in-chief, the state offered the testimony of twenty-seven witnesses, which included Johnson's friends and acquaintances, police, forensic examiners, and medical examiners, among others.
Michael Knapp, an acquaintance, testified on the night of the shooting Johnson and Ramjit were at Johnson's house drinking. He further testified regarding the confrontation between Ramjit and Clarence Harris (a.k.a. Snoop) and stated Johnson had a knife but did not do anything with it, it was in his coat pocket. He also testified Johnson told him he had a gun inside his house and the day after the shooting, he observed Johnson's car in the garage, rather than its usual parking place in the driveway.
Twelve-year-old Jamie MacGregor, one of Johnson's neighbors, testified she also observed the argument between Snoop and Ramjit and thought Johnson had a knife. She further stated it sounded like Johnson threatened to stab somebody. She, like Knapp, noticed Johnson put his car in the garage. MacGregor observed Johnson cleaning the car.
Snoop testified Beller, the victim, had been smoking pot on the night of the shooting. He also stated Johnson was not armed or involved in the altercation and did not threaten to kill anyone.
Laquan Stowers, Johnson's cousin, testified he and Johnson had a falling out over money. He further testified Johnson did not have any weapons and believed that either Ramjit or Johnson owed Beller $250, apparently for drugs that had been purchased.
Sean Alvis, another member of the clique, testified he and Beller went to the Winking Lizard approximately 9:00 p.m. and then to Alvis' cousin's home for a birthday party. Johnson phoned that home an hour later and spoke with Cliff, who left shortly after speaking with Johnson, telling Alvis he was going to get the money Johnson owed him. Alvis further testified Johnson portrayed himself as being in a gang. Alvis also identified an AK 47 and stated it belonged to Johnson. On cross-examination, however, Alvis admitted he had been told the gun belonged to Ramjit and he never saw Johnson carrying a gun.
Charles Santamaria testified he saw an AK 47 at Johnson's home in 1997 and a .40 caliber pistol at Ramjit's home on Christmas eve with the serial number scratched off. He stated he initially thought the AK 47 belonged to Johnson but was told it actually belonged to Ramjit and Johnson had been keeping it for him.
Jesse Woodall, a high school friend of Johnson's, testified Johnson told him he was going to get a gun and he saw Johnson with a chrome handgun a few months before Christmas.
John Weseloh, a Cleveland Metroparks ranger, testified he located a pair of blue latex gloves on the south side of Sagamore Road.
Cleveland Metroparks ranger John Manzatt testified he interviewed Johnson on two occasions; during the first interview, Johnson stated on the night of the shooting, he went to Slam Jams and then home and did not leave the rest of the night. The following day, Johnson stated he and Ramjit met up with Beller at the park to meet another party so that Beller could get his money. Johnson told Manzatt his vehicle got stuck in the snow, Beller pushed him out and as he began to drive away, he heard several gun shots. Ramjit got into his car and Johnson drove to his house. Johnson also stated Ramjit admitted to the shooting and told him if he said anything, Ramjit would kill him. After conducting a search of Johnson's home, an AK 47 was found in the basement. A search of an apartment where Johnson stayed intermittently revealed a bullet-proof vest, drug paraphernalia and marijuana.
The state then rested. The defense did not introduce any evidence.
After viewing the evidence in a light most favorable to the prosecution, we have concluded any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
Regarding the manifest weight of the evidence, the court in State v. Martin[3], stated:
 The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.
Additionally, the court in State v. Thompkins[4], stated:
 Weight of the evidence concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them.
Further, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact.[5] After reviewing the entire record in this case, weighing the evidence and all reasonable inferences and considering the credibility of the witnesses, we cannot conclude that in resolving conflicts in the evidence, the jury clearly lost its way and created a manifest miscarriage of justice. Accordingly, this assignment of error is not well taken and it is overruled.
Johnson next argues his counsel had been ineffective because he revealed a privileged communication regarding the location of the blue latex gloves to Manzatt.
In Strickland v. Washington[6], the court established a two-part test for consideration in addressing claims of ineffective assistance of counsel:
 * * * First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.
In State v. Bradley[7], paragraph three of the syllabus, the court stated:
 In order to show prejudice, the defendant must demonstrate a reasonable probability exists that, absent counsel's error, the result of the trial would have been different.
In People v. Meredith[8], the court held inadmissible a communication from an attorney to the police regarding evidence from his client as to the whereabouts of key evidence in a trial. The court stated:
 In offering the evidence, the prosecution should present the information in a manner which avoids revealing the content of the attorney-client communications or the original source of the information. In the present case, for example, the prosecutor simply asked Frick where he found the wallet; he did not identify Frick as a defense investigator or trace the discovery of the wallet to an attorney-client communication. In other circumstances, when it is not possible to elicit such testimony without identifying the witness as the defendant's attorney or investigator, the defendant may be willing to enter a stipulation which will simply inform the jury as to the relevant location or condition of the evidence in question. When such a stipulation is proffered, the prosecution should not be permitted to reject the stipulation in the hope that by requiring defense counsel personally to testify to such facts, the jury might infer that counsel learned those facts from the defendant.[9]
Here, the following stipulation was read to the jury:
 * * * That as a result of a telephone call with Mr. Belcher, Officer Manzatt, Cleveland Metropark Ranger, went to the scene of the offense and found a pair of blue gloves on the roadway outside the parking area of Sagamore Hills Picnic Area, specifically on Sagamore Road east of the picnic area.
After this stipulation had been read, it was apparent that defense counsel had learned from his client the whereabouts of the evidence and had communicated that information to the police.
However, the evidence presented against Johnson mitigates the impact of his defense attorney's communication to Manzatt. Therefore, we conclude Johnson failed to prove that but for counsel's error the results of the trial would have been different. Accordingly, this assignment of error is overruled.
In his third assignment of error, Johnson argues the court erred in permitting testimony regarding the AK 47, Johnson's possible gang affiliations, his reputation as a bad ass and his alleged involvement in dealing drugs.
In State v. Sage[10], the court stated in paragraph two of its syllabus:
 The admission or exclusion of relevant evidence rests within the sound discretion of the trial court.
Additionally, in State v. Combs[11], the court stated:
 Even relevant evidence may be excluded, under Evid.R. 403(A), if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.[12]
Further,
 In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.[13]
In State v. Rogers[14], we stated:
 In State v. Smith (1985) 29 Ohio App.3d 9, this court stated:
 Ohio case law provides little guidance in assessing the issue of prejudice inherent when evidence of an unrelated weapon is admitted at a criminal trial. The federal courts, however, have held that the admission of such evidence constitutes reversible error.
* * *
 In United States v. Green (C.A. 9, 1981), 648 F.2d 587, the Ninth Circuit noted that:
 "` * * * "Ordinarily the admission into evidence of weapons, or pictures of weapons, which are not directly related to the crime, and to which proper objection is made, is prejudicial to the defendant and in many cases has been held to be reversible error." * * *'"
In this case, the state introduced evidence of the AK 47 to establish that the identification of the murder weapon was a .40 caliber pistol because nine live rounds of ammunition for an AK 47 had been found in Beller's Jeep. Additionally, the AK 47 was found by police in Johnson's home. Without the testimony of Santamaria, who clarified for the jury that the AK 47 belonged to Ramjit, the jury could have believed Johnson shot Beller. The AK 47 is directly related to the crime because it was eliminated as the murder weapon. Therefore, the court properly admitted the weapon and the testimony regarding it.
Johnson also raised an issue regarding Alvis' testimony that Johnson was known to be armed. We note that Johnson's counsel objected, the trial court sustained the objection, and then instructed the jury to disregard the statement. Therefore, there is not error.
Alvis also testified as to Johnson's reputation as a bad ass and that he portrayed himself to be a gang member. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith, except that evidence of a pertinent trait offered by the accused or by the prosecutor to rebut the same is admissible.[15] Additionally, in all cases in which evidence of a trait is admissible, proof may be made by testimony as to reputation.[16] Therefore, the court did not err when it allowed Alvis' testimony because it was offered to rebut the defense's assertion that Johnson was not a drug dealer or a gang member and subsequently had nothing to do with Beller's murder.
Cumulatively, this evidence was admitted to motive for the shooting. Beller was killed because either Johnson or Ramjit owed him money for drugs that had been purchased. Accordingly, this assignment of error is overruled.
In his fourth assignment of error, Johnson alleges the admission of crime scene and autopsy evidence violated Evid.R. 403(A) and denied him a fair trial.
Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusions of the issues or of misleading the jury.[17] Here, Johnson argues photos of the crime scene, the blood-splattered Jeep, the victim's blood-soaked clothing, and the victim should not have been admitted because they were gruesome, cumulative and inflammatory. However, properly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to an appellant is outweighed by their probative value and the photographs are not repetitive and cumulative in nature.[18]
In this case, the photographs were admitted because they illustrated the testimony of police officers, pathologists and forensics experts. Any prejudice accompanying these exhibits are outweighed by the probative value. Accordingly, the trial court did not err and this assignment is overruled.
Johnson also alleges prosecutorial misconduct during closing argument denied him due process. Specifically, he argues the prosecutor implied state's witnesses were afraid of Johnson.
The court in State v. Turner[19], stated:
 The trial court instructed the jury that opening statements and closing arguments were not evidence * * *. Such curative instructions amply protected the appellant's right to a fair trial.
Further, our review is guided by State v. Phillips[20]:
 The conduct of a prosecuting attorney during trial cannot be made a ground of error unless the conduct deprives defendant of a fair trial.
Additionally, Johnson complains the prosecutor improperly implicated him as an aider and abettor and the jury instructions did not correct this error. In State v. Underwood[21], the court stated in its syllabus:
 The failure to object to a jury instruction constitutes a waiver of any claim or error relative thereto, unless, but for the error, the outcome of the trial clearly would have been otherwise.
Here, the prosecutor stated in closing argument:
 First, there's Mike Knapp. Who is he? He's the boyfriend of the Defendant's next door neighbor — right next door. Now, what did he add to it? Mike, did you see a weapon [on] the Defendant? No. Mike, did you hear the Defendant threaten to kill anyone? No. What did you think of Mike's demeanor? It's your job to judge the credibility of witnesses. Did he appear frightened or scared at all to you? Did he appear normal in any way? That is you decision. You have to decide that.
The prosecutor was reminding the jury that it is the function of a jury to judge the credibility of every witness testifying. In our view, the prosecutor did not state the witness was afraid of Johnson, she simply asked the jury to remember his demeanor on the stand and assess the truthfulness of his testimony. Hence, we find no error.
Additionally, with respect to Johnson's allegation that the jury instructions did not clarify the issue of aiding and abetting, we note that because he did not object to the jury instructions, he cannot raise this issue on appeal. Accordingly, this assignment of error is overruled and the judgment of the trial court is affirmed.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
DIANE KARPINSKI, A.J., and KENNETH A. ROCCO, J., CONCUR.
[1] Crim.R. 29(A)
[2] (1991), 61 Ohio St.3d 259, 574 N.E.2d 492.
[3] (1983), 20 Ohio App.3d 172, 485 N.E.2d 717.
[4] (1997), 78 Ohio St.3d 380, 678 N.E.2d 541.
[5] State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212.
[6] (1984), 466 U.S. 668.
[7] (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.
[8] (1981), 29 Cal.3d 682, 631 P.2d 46.
[9] Id. At 695, 54, f.n. 8.
[10] (1987), 31 Ohio St.3d 173, 510 N.E.2d 343.
[11] (1991), 62 Ohio St.3d 278, 581 N.E.2d 1071.
[12] Evid.R. 404(B).
[13] R.C. 2945.59.
[14] 1991 Ohio App. LEXIS 2715, (June 6, 1991) Cuyahoga App. No. 58557, unreported.
[15] Evid.R. 404(A)(1)).
[16] Evid.R. 405.
[17] Evid.R. 403(A).
[18] State v. Frazier (1995), 73 Ohio St.3d 323, 652 N.E.2d 1000.
[19] (1993) 91 Ohio App.3d 153, 631 N.E.2d 1117.
[20] (1995), 74 Ohio St.3d 72, 656 N.E.2d 643.
[21] (1983), 3 Ohio St.3d 12, 444 N.E.2d 1332.